# United States Court of Appeals
## For the First Circuit

Nos. 11-1660,
     11-1742

UNITED STATES OF AMERICA,

Appellee,

v.

RAQUEL DELGADO-MARRERO,
ÁNGEL L. RIVERA-CLAUDIO,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Howard and Thompson,
Circuit Judges.

Rafael F. Castro-Lang, for appellant Delgado.
Linda Backiel, for appellant Rivera.
Jacqueline D. Novas-Debién, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney,
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, and Luke Cass, Assistant United States
Attorney, were on brief for appellee.

February 11, 2014

**TORRUELLA, Circuit Judge.** Former San Juan Municipal Police Officers Raquel Delgado-Marrero ("Delgado") and Ángel Rivera-Claudio ("Rivera") were convicted by a jury on drug and gun charges arising from an FBI reverse sting operation called "Operation Guard Shack." They each received a fifteen-year sentence. On appeal, Delgado and Rivera raise multiple challenges, claiming both trial and sentencing errors by the district court. They each seek either a new trial or resentencing.

Our discussion begins with Delgado's contention that the district court committed reversible error by excluding the testimony of a defense witness. Because we agree with Delgado that the district court erred on this front, and that a new trial is needed to mend the error, we do not address any of her other appellate challenges.

With respect to Rivera, we agree that his sentence cannot withstand the Supreme Court's decision in Alleyne v. United States, 133 S. Ct. 2151 (2013). Applying Alleyne retroactively, we find that the district court plainly erred in articulating the jury instructions imparted in connection with a post-verdict special jury form. We further find that Rivera's other claims of error ultimately fail.

The necessary details follow, with a recitation of "the facts in the light most favorable to the government." United States v. Flores-Rivera, 56 F.3d 319, 322 (1st Cir. 1995).

## I. Background

A. <u>Operation Guard Shack</u>

The FBI launched "Operation Guard Shack" as part of its efforts to combat police corruption throughout Puerto Rico.[1] As relevant here, the FBI hired a Puerto Rico Police officer ("Officer I") to pose undercover as a corrupt policeman with close ties to a mid-to-high-level local drug dealer.[2] Officer I's main responsibility was to recruit fellow police officers willing to provide armed security during a staged "multi-kilo" drug transaction. The FBI also hired another undercover Puerto Rico Police officer, "Officer II," to play the role of the dealer during the staged drug transaction.

Delgado and Rivera were working partners stationed at the Antillas Police Precinct in San Juan, Puerto Rico. Delgado, a

---

[1]  According to an official press release issued by the United States Justice Department, Operation Guard Shack was "the largest police corruption investigation in the history of the FBI," and involved "125 undercover drug transactions conducted . . . in several locations in Puerto Rico, from July 2008 until September 2010." The operation yielded 26 indictments against 89 law enforcement officers and 44 other civilians.

[2]  To protect their identities, we omit all references to the names of the undercover agents involved in the case. For his participation in Operation Guard Shack, Officer I received $1,400 monthly, but his contract with the FBI was subject to a six-month review and could be terminated at will. Officer I was also provided with "expensive" cars in order to portray the image of a corrupt officer who had money to spend. At the time Officer I contracted with the FBI, his entire salary from the Puerto Rico Police Department was being garnished on account of a child support debt.

divorced mother of two, had no prior criminal record. She began her career as a municipal police officer in her late twenties. Before her arrest in 2010, Delgado had enjoyed five years of experience on the force, had never been the subject of an administrative complaint, and had received the award of "Municipal Police Woman of 2009." For his part, Rivera, who was twenty-four years old at the time of his arrest, enjoyed four years of experience in the municipal police force and, like Delgado, had untarnished criminal and administrative records.

Officer I reached out to Delgado sometime in the middle of 2009 as part of his undercover role as a corrupt policeman. Officer I knew Delgado from childhood. They grew up near each other, were middle-school classmates, and had once shared a close-knit circle of friends. After middle school, however, Officer I and Delgado went their separate ways and eventually lost touch with each other.

More than a decade later, Officer I identified Delgado as a possible target of Operation Guard Shack during a conversation with her ex-husband, who had asked to meet with him for an unrelated personal matter.[3] During the meeting, when Officer I asked about Delgado, her ex-husband told him that they were no

___

[3] Delgado's ex-husband was also a municipal police officer whom Officer I knew from childhood. He met with Officer I to discuss drug-related problems in his neighborhood and to ask if more patrolling could be provided. The ex-husband's current spouse was present during the meeting.

longer together and that Delgado had several part-time jobs providing nighttime door security at veterinarian clinics as well as some pubs. Delgado's ex-husband also shared with Officer I his distaste for Delgado's part-time jobs, stating that he was concerned that the jobs were in unsafe locations. According to his testimony at trial, Officer I understood the ex-husband's concerns to mean that Delgado was part-timing in places where drug-trafficking activities occurred.

Officer I asked for Delgado's phone number during a second meeting with her ex-husband. Soon thereafter, he called her to see whether she was in fact doing part-time jobs at questionable locations. Although the FBI had instructed that phone conversations with Operation Guard Shack targets be recorded,[4] Officer I testified at trial that he was unable to record the first call with Delgado because he made it while on duty, with fellow officers nearby. Another unrecorded phone call took place shortly thereafter; Officer I testified that he could not record that conversation because some of his family members were nearby when he placed the call.

Officer I recorded a phone conversation with Delgado for the first time on July 20, 2009. The transcript of that conversation reflects that Officer I had previously invited

---

[4]  The FBI provided Officer I with special recording equipment for this purpose.

Delgado, and she had agreed, to participate in a drug transaction, in which Delgado and an unnamed fellow officer[5] would provide security in exchange for $2,000 each.[6]

Officer I recorded a second call with Delgado on July 23, 2009. This time, as depicted in the call's transcript, Officer I explained to Delgado that the transaction would take place inside a house; that Delgado and the fellow officer's job was simply to frisk two people that would come to pick up the "kilos"; that the job would begin at 8:00 p.m. and would last thirty minutes to an hour; and that Officer I would personally direct Delgado on how to get to the house.

B. The Sham Transaction

The sham drug transaction took place the next day. With the assistance of Officer I, who provided final minute-by-minute directions by phone, Delgado and Rivera arrived at the apartment in the municipality of Dorado, Puerto Rico, where the "transaction" was to take place. Officer I and Officer II waited in the apartment, where the FBI had placed hidden cameras and microphones in order to record the events.[7] Also in the apartment was a duffle

---

[5]  The fellow officer turned out to be Rivera, whom Delgado convinced to accompany her during the transaction.

[6]  Neither the word "drug" nor any specific type of drug was mentioned during the conversation, but Delgado testified at trial that she assumed the transaction involved drugs.

[7]  A crew of FBI agents controlled the hidden equipment and monitored the events from an apartment next door.

bag containing the purported drugs underlying the sham transaction -- seven packages, or "bricks," that the FBI had prepared to resemble one-kilogram blocks of actual cocaine.

The video recording of the "transaction" begins when Delgado and Rivera step into the apartment. Officer I, Delgado, and Rivera enter in full view of a hidden camera that was recording the entry door and foyer area of the apartment. To the left of the entry door is a kitchen, and Officer I offers drinks to Delgado and Rivera. Delgado takes a soda and Rivera a beer. Officer I then ushers them into a living room, where Officer II, in his role as a drug dealer, sits in the middle of a large L-shaped sectional sofa.

Another hidden camera captures the moment when Officer I, Delgado, and Rivera come into the living room. Officer I and Rivera sit on the sofa where Officer II awaits seated. Delgado asks where the bathroom is and steps out of the camera's range.

While Delgado is in the bathroom, Officer I and Officer II engage Rivera in friendly banter. Among other things, they ask Rivera about the type of gun given to the municipal police. Rivera states that he dislikes the old, secondhand gun he was provided, and, upon further probing from Officer I, retrieves the gun from underneath his jacket, waves it in the air so that the others can see it, and tucks it back in. Officer I and Officer II also show Rivera the gun each is carrying. When Delgado returns from the bathroom, the gun-related discussion continues, and she also shows

her official gun, which she was carrying inside her waistband, hidden underneath her shirt. Delgado then sits down on the sofa between Rivera and Officer II.

The friendly banter continues for half an hour, including remarks about Delgado's birthday party, which is happening later that night. The conversation is interrupted when the purported drug buyer knocks at the door.[8] Immediately, Officer II instructs Rivera to open the door and to make sure that nobody enters the apartment armed. Rivera picks up a set of keys from the coffee table in front of the sofa and leaves to open the door. Officer I gets up and signals Delgado to follow him in order to assist Rivera. She gets up and follows Officer I out of the living room.

The hidden camera recording the area of the entry door captures Rivera approaching. He opens the door and orders the purported drug buyer to stand still and proceeds to frisk him.[9] Finding no weapons on the newcomer, Rivera walks him to the living room. There, the purported buyer greets Officer II and sits down on the sofa, and Officer I and Rivera return to their seats. Delgado remains standing and goes in and out of the camera's frame,

---

[8] Another undercover agent ("Officer III") plays the part of the buyer.

[9] Although not seen on the video footage provided to us, another hidden camera apparently captured Officer I and Delgado in the hallway watching Rivera frisking the purported drug buyer. Officer I's trial testimony corroborated that they were in the hallway watching Rivera.

but her voice can sometimes be heard as she participates in the conversation.

The friendly banter continues exactly where it left off. It is interrupted approximately fifteen minutes later, when the purported buyer tells Officer II to bring him the "stuff" because he is leaving.  Officer II then casually tells Rivera to call an elevator that is apparently nearby, while at the same time signaling to him the direction of the elevator he is referring to. Rivera gets up from the sofa and walks away from the hidden camera's view.  Officer II then tells Rivera, who is still out of view but apparently in the living room, to wait for the elevator doors to open and to hand what is inside the elevator to the buyer. A few seconds later, Rivera comes back carrying a duffle bag.  He hands it to the buyer, and sits down on the sofa next to him.

Though the coffee table in front of the sofa blocks the camera's view, it appears that the purported buyer places the bag on the floor, between his legs, and opens it.  He takes two packages out of the bag and stacks them on top of the coffee table. He does the same with two additional packages.  He next seems to fiddle with something in the bag.  Rivera remains seated to the right of the buyer.  Delgado is still standing and does not appear in the video at this moment.  One of Delgado's hands, which holds a cellular phone, comes into the camera's frame briefly a few

times.  Her voice can also be heard during the conversation, so it is safe to conclude that she remains somewhere in the living room.

The jovial atmosphere continues.  Approximately a minute after placing the four packages on the coffee table, the purported buyer places them back into the duffle bag, closes it, stands up, places the carrying strap of the bag on his left shoulder, shakes hands with everyone, and walks to the entry door escorted by Rivera.  Delgado stays in the living room chatting with Officer I and Officer II.  When Rivera returns, Delgado goes to the bathroom a second time.

A new round of banter begins with Rivera, Officer I, and Officer II sitting around the sofa.  Delgado joins in when she returns from the bathroom, though her attention often centers on her cellular phone, as she appears to be exchanging text messages with someone.  A few minutes into the conversation, Officer II instructs Officer I to go get the "guys' stuff."  Officer I walks out of the living room, away from the hidden camera's view.  He appears back in the video a minute later holding two beers in his left hand and a stack of money in his right.  He places the two beers on the coffee table in front of Rivera and Delgado, then sits down on the sofa to the left of Officer II.  Between jokes and laughter, Officer I counts the money, eventually handing $1,000 in $20 bills to Rivera.  Rivera counts the money given to him. Officer I and Rivera follow the same routine until $4,000 in cash

exchanges hands. Upon Officer II's inquiry, Delgado and Rivera state that they are available to do a second job later on.

They are still on the sofa, jovially chatting with Officer I and Officer II, when the video recording from the camera in the living room cuts off. The video recording from the hidden camera in the entry area cuts off around the same time. One hour and a few minutes have lapsed since Delgado and Rivera stepped into the apartment.

C. The Arrest and Trial

The FBI arrested Delgado and Rivera on October 6, 2010, pursuant to a four-count indictment. Count One alleged that Delgado and Rivera knowingly and intentionally conspired to possess with intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841 and 846. Count Two charged that Delgado and Rivera aided and abetted each other in an attempt to possess with intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine, in violation of §§ 841 and 846, and 18 U.S.C. § 2. Counts Three and Four alleged that Delgado and Rivera, respectively, knowingly possessed a firearm in furtherance of the drug trafficking crimes charged in Counts One and Two, in violation of 18 U.S.C. § 924(c)(1)(A).

At trial, the government presented three witnesses: Officer I, Officer II, and the FBI special agent (the "Special

Agent") who prepared the apartment and the duffle bag for the transaction. It also introduced into evidence (1) the two recorded phone calls between Officer I and Delgado; (2) the video recording of the transaction; and (3) five pictures of the duffle bag containing the "bricks" before the FBI placed it in the Dorado apartment. The government's theory was that the video recording of the transaction spoke for itself and showed guilt beyond reasonable doubt on all counts.

In her defense, Delgado argued entrapment. She presented her own testimony and the testimony of her ex-husband. In support of her entrapment defense, Delgado testified that for approximately one month, she rejected Officer I's persistent invitations of part-time employment; that during this period, Officer I called her repeatedly and sometimes took her out on dates; that she had romantic, sexual affairs with Officer I in 2005 and 2009; that weeks after the transaction, Officer I took her out on a date during which they had sexual intercourse; and that Officer I preyed on their long-lasting friendship and trust to overcome her expressed and firm resistance to participate in the transaction.

Despite this reluctance, Delgado testified that she finally gave into Officer I's insistent pressure. She further explained that she contacted her partner, Rivera, and that they "decided to go to the place" where the part-time job organized by Officer I was to be held. She stated that, following directions

-12-

from Officer I, she asked for $2,000 each -- for herself and Rivera -- in exchange for their roles in the deal; that Rivera drove her to the apartment depicted in the video; and that the two partners entered the apartment together with Officer I. She admitted that she was aware that the "bricks" involved in the transaction were narcotics and that she was doing something wrong, but she maintained that she only participated in the transaction because of Officer I's insistence, because of the "sentimental or romantic relationship" she had with him, and because of her trust in him.

In further support of her entrapment defense, Delgado sought to present the testimony of Brenda Rosa-Valentín ("Rosa-Valentín"), the younger sister of a fellow policeman Officer I grew up with and considered a dear friend. But on an objection by the government, the court decided to hear her testimony outside the presence of the jury, and ultimately ruled it inadmissable extrinsic evidence under Fed. R. Evid. 608(b).

Rivera neither took the stand nor presented any witnesses in his defense.[10] During opening statements,[11] Rivera's counsel told the jury that he intended to show that Rivera "was not guilty of conspiracy as charged in the Indictment," and that Rivera had no intention of participating in the transaction before Officer I

---

[10] Rivera and Delgado each had their own counsel.

[11] The defendants' opening statements were deferred until the beginning of their case-in-chief.

-13-

lured Delgado into it.  Although the record shows that counsel told the court that he intended to present a derivative entrapment defense, the court ultimately did not allow the defense.[12]

After a three-day trial, the jury found Delgado and Rivera guilty on all counts.  They were each sentenced to concurrent terms of ten years on Counts One and Two, corresponding to the statutory minimum under 21 U.S.C. § 841(b)(1)(A) for possession with intent to distribute five kilograms or more of cocaine.  On Counts Three and Four, respectively, Delgado and Rivera each received a five-year sentence for possession of a firearm in relation to a drug trafficking crime, to run consecutively with their ten-year sentences under Counts One and Two, for total terms of imprisonment of fifteen years each.  This consolidated appeal timely ensued.

## II. **Discussion**

A. Delgado's Evidentiary Challenge

As relevant here, Delgado argues that the district court committed reversible error in excluding Rosa-Valentín's testimony, which "prevented [her] from presenting important evidence that

---

[12]   For a discussion of the derivative entrapment defense, see United States v. Washington, 106 F.3d 983, 992-96 (D.C. Cir. 1997) (cited by United States v. Luisi, 482 F.3d 43, 52-58 (1st Cir. 2007) (discussing third-party entrapment, and distinguishing derivative entrapment from vicarious entrapment)).  On appeal, Rivera does not challenge the district court's determination that the derivative entrapment defense was unavailable to him.  In his appellate brief, Rivera states that his "only defense" at trial was the "right to the presumption of innocence."

-14-

[would have] aided . . . in establishing her only defense, that she was entrapped by [Officer I] in participating in the offense conduct."  We agree.

1. Background

When the defense examined Officer I, the government objected, on relevancy grounds, to a question regarding his recollection of prior interactions with Rosa-Valentín.  At sidebar, Delgado's counsel proffered that Rosa-Valentín, who was one of Delgado's witnesses, would testify that Officer I had offered her money in exchange for providing contact information of policemen to entrap.  Rosa-Valentín would also testify that Officer I had confessed to her his desire to kill a man he thought had wronged her brother.[13]  Following the proffer, the court stated: "Well, I will not allow you to ask [about] that unless I first hear that from [Rosa-Valentín]. . . .  Because I think this is too much of a stretch.  If you give me . . . some foundation evidence that he has done that, I will allow you to [recall Officer I]."

When the interrogation resumed, Officer I admitted that he had offered money to Rosa-Valentín in exchange for police officers' names.  When asked about the timing of his proposal, Officer I said that he first mentioned it to Rosa-Valentín indirectly during a chance encounter with her while on duty

---

[13]  Apparently, the wife of Rosa-Valentín's brother committed suicide in the middle of an extramarital affair with the man whom Officer I allegedly said that he wanted to kill.

-15-

patrolling his sector.  In this regard, Officer I testified that, in responding to a late-night complaint about noise and loud music, he arrived at a commercial establishment where a birthday party appeared to be taking place.  The party turned out to be Rosa-Valentín's.  As Officer I recounted: "[W]hen the person that came out to explain why the music was so loud turned out to be her, I greeted everybody and then I continued patrolling.  I explained to her that they needed to lower the music down, and . . . they told me that they were just about to close."  Officer I denied having any beers or allowing the party to continue after 2:00 a.m. in contravention of a municipal ordinance.  He also denied going to Rosa-Valentín's house looking for her more than fifteen times after the birthday party.

As proffered, Delgado called Rosa-Valentín to the witness stand as part of her case-in-chief.  The government immediately objected, arguing that the testimony was irrelevant.  At sidebar, defense counsel repeated the proffer previously given about Rosa-Valentín's testimony, and the court stated that it would have "to hear the evidence outside of the presence of the jury . . . to see if it's relevant."

Outside the presence of the jury, Rosa-Valentín stated that Officer I was her brother's lifelong friend and that she had

known him for approximately thirty-three to thirty-four years.[14]
She also stated that, during the funeral services for her sister-
in-law, Officer I told her twice that he wanted to kill the man
involved in the extramarital affair that allegedly caused the
suicide.

Rosa-Valentín further testified that Officer I "used to
tell [her] when he came home all the things that he used to do."
Specifically, she testified that Officer I mentioned to her that he
would go to a drug point in his patrolling sector, arrest a seller,
"and [he] would tell the guy to call his boss. . . . [W]henever
they got in touch with the drug dealer, [he] would tell him that in
order to release his runner, he was going to have to give him
something in return, either weapons, drugs, or money." Similarly,
Rosa-Valentín testified that Officer I told her of other instances
in which he would fabricate cases and arrest people to ask "for
either drugs, weapons, or money, and he told [her] that he would
always ask for weapons."

Rosa-Valentín next gave her version of the interactions
she had with Officer I on the day of her birthday. According to
her testimony, after greeting Officer I that night, he told her

---

[14] Rosa-Valentín worked as a restaurant waitress at the time of her
testimony. She was asked whether she had a romantic relationship
with Officer I. She answered: "No, never." She was also asked
about the extent of her relationship with Delgado, and she said
that Delgado "was a friend of her brother" but that Delgado and she
did not "have a relationship as friends."

that "he was [on duty] in a [nearby] park so he could spend some time with us at the [party]." While at the party, she said that Officer I had around eight or nine beers. She stated that, at some point, a police sergeant drove by the party, but that the party was allowed to continue until 4:30 a.m. after Officer I spoke to the sergeant. Officer I left the party at around 1:30 or 2:00 a.m., but came back later. After the establishment where the party was being held had closed, Rosa-Valentín's guests (including Officer I) went to her house and continued the gathering until 6:00 a.m. Before the party was over, Officer I mentioned to Rosa-Valentín that he would come back the next day because he needed to talk to her.

According to Rosa-Valentín's testimony, Officer I came to her house the next day. Her account of that visit was as follows:

> He came in [driving] the patrol car, like he always did, wearing his uniform. . . . He asked me if I could get some police officers for him . . . . He asked me if I could get some for him to do some part-time work, and I told him I would check, because I have a friend who already had part-time jobs. They worked at gas stations, that kind of thing. Again, he emphasized whether I had the phone number, whether I had it in a safe place. I said I did. And he told me that if anything came up, that I should call him, that he was offering me $5,000 for every cop that I brought to him.

Rosa-Valentín also stated that Officer I persistently followed up on his inquiry: "during the day he would come three, four, five, six, seven times . . . then at night he would come in a patrol

-18-

car." Officer I kept this routine up for four months, beginning in February and ending in mid-June.

Lastly, Rosa-Valentín testified that, when she refused to provide any information to Officer I, he invited her to do part-time work herself. She said that, when she asked what the part-time work would be, Officer I told her to go to an apartment in the municipality of Guaynabo, "and [that] he would talk to [her] over there." Officer I also told her that she could go to the apartment with her kids, that there was a pool and a tennis court in the complex, and that they would have a good time there.

After a brief examination by the government, the district court found Rosa-Valentín's testimony inadmissible under Fed. R. Evid. 608(b).[15] In so ruling, it rejected defense counsel's argument that Rosa-Valentín's testimony directly contradicted portions of Officer I's testimony. Counsel further argued that Rosa-Valentín's testimony was relevant to Delgado's entrapment defense. But the court ruled the entire testimony to be "nothing else but an attempt to circumvent Rule 608."

---

[15] The defendants argued that the evidence was admissible under Rules 404 and 613. The government stated that Rule 404 was inapplicable because Officer I was not a defendant, and the court agreed. The court sua sponte found Rule 613 inapplicable without explaining its reasoning.

2. <u>Applicable Law and Analysis</u>

We review the district court's evidentiary findings for abuse of discretion, <u>United States</u> v. <u>Pelletier</u>, 666 F.3d 1, 5 (1st Cir. 2011), and reverse when, among other reasons, a decision rests on an erroneous conclusion of law. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Pires</u>, 642 F.3d 1, 10 (1st Cir. 2011). Where, as here, a defendant challenges a conviction on account of an evidentiary error, the verdict will not be overturned if "it is highly probable that the error did not affect the verdict." <u>United States</u> v. <u>Pridgen</u>, 518 F.3d 87, 91 (1st Cir. 2008). Put differently, "even if [an evidentiary] error occurred, it would not serve to overturn a conviction if it ultimately proved harmless." <u>United States</u> v. <u>Landrón-Class</u>, 696 F.3d 62, 68 (1st Cir. 2012). In this case, Delgado has demonstrated error, and the government has not met its burden of showing that the error was harmless. <u>See</u> <u>United States</u> v. <u>Meises</u>, 645 F.3d 5, 24 (1st Cir. 2011).

Our inquiry revolves around Rule 608(b), which in pertinent part prohibits the admission of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's <u>character</u> <u>for</u> <u>truthfulness</u>." Fed. R. Evid. 608(b) (emphasis supplied). The phrase "character for truthfulness" was incorporated into the Rule by amendment in 2003.[16]

---

[16] In pertinent part, the prior rule read as follows: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by

-20-

The amendment sought to conform the Rule's language to the drafters' original intent, which was to exclude extrinsic evidence of a witness's general propensity for honesty and truth, rather than particular instances of honesty or dishonesty used for other non-propensity purposes. <u>See</u> Fed. R. Evid. 608(b) advisory committee's note.

Rule 608(b) was thus amended to do away with the mistaken notion that its reach extended to extrinsic evidence offered for general impeachment purposes, such as, for example, contradictions, prior inconsistent statements, bias, or mental capacity. <u>Id.</u> After the amendment, courts routinely find Rule 608(b) inapplicable to general impeachment evidence. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Taylor</u>, 426 F. App'x 702, 706 (11th Cir. 2011) (per curiam) (holding that Rule 608(b) did not bar testimony that contradicted defendant's story); <u>United States</u> v. <u>Skelton</u>, 514 F.3d 433, 441–42 (5th Cir. 2008) (stating that Rule 608(b) is inapplicable in determining the admissibility of evidence introduced to contradict a witness's testimony as to a material issue); <u>United States</u> v. <u>Magallanez</u>, 408 F.3d 672, 680–81 (10th Cir. 2005) (holding Rule 608(b) inapplicable because "the evidence was introduced not to 'attack' the witness's 'character'" but to demonstrate that a statement made during direct examination was false).

---

extrinsic evidence."

-21-

We examine the excluded testimony against this backdrop. As previously stated, Delgado avers that Rosa-Valentín's testimony contradicted Officer I's in several respects, and it is clear from the record that this was the case. Officer I, among other things, disavowed constantly visiting Rosa-Valentín after her birthday, whereas in her proffer she stated that it was precisely thereafter that Officer I harassed her for approximately four months, insisting that he be provided with contact information of police officers to do part-time work, sometimes going to her house more than seven times per day. Rule 608(b) does not preclude the introduction of this type of impeachment evidence. See Taylor, 426 F. App'x at 706; Skelton, 514 F.3d at 441-42; Magallanez, 408 F.3d at 680-81.

More importantly, however, we agree with Delgado that Rosa-Valentín's testimony would have shown how Officer I went about his participation in Operation Guard Shack and would thus support her entrapment defense. See United States v. Rizvanovic, 572 F.3d 1152, 1155 n.1 (10th Cir. 2009) ("Rule 608(b) does not bar extrinsic evidence to the extent it goes to substantive issues, and here the rebuttal evidence tended to disprove Defendant's affirmative defense . . . ."); see also United States v. Montelongo, 420 F.3d 1169, 1175 (10th Cir. 2005) (finding that Rule 608(b) does not preclude evidence negating a defendant's guilt).

It is black-letter law that an entrapment defense has two elements: "'(1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct.'" United States v. Sánchez-Berríos, 424 F.3d 65, 76 (1st Cir. 2005) (quoting United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988)).[17] In connection with the inducement prong, Rosa-Valentín and Delgado painted a similar picture of Officer I's relentless pursuit of Operation Guard Shack part-time workers. Rosa-Valentín testified that Officer I offered her large amounts of money and pursued her for four months -- sometimes going to her house more than seven times a day -- trying to win her over so that she would provide contact information for part-time employees. In Delgado's case, she testified that Officer I courted her almost daily for approximately one month before she capitulated. See United States v. Groll, 992 F.2d 755, 759 (7th

---

[17] A prima facie showing of both elements is needed before a district court may instruct the jury to consider the defense. United States v. Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012). In this case, the district court found that Delgado satisfied her prima facie burden through her testimony, and thus instructed the jury to consider her entrapment defense.

Demarcating the contours of the entrapment defense, the Supreme Court has noted that "'[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises.'" Jacobson v. United States, 503 U.S. 540, 548 (1992) (quoting Sorrells v. United States, 287 U.S. 435, 441 (1932)). Nonetheless, the Court has cautioned law enforcement officers and prosecutors that "[i]n their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." Id.

-23-

Cir. 1993) (finding that evidence of informant calling defendant on a daily basis for over a month requesting marijuana and threatening the defendant constituted a colorable entrapment defense).

Delgado's and Rosa-Valentín's testimonies similarly reflected that Officer I tried to lure them into Operation Guard Shack activities by appealing to their long-lasting friendships. See United States v. Wright, 921 F.2d 42, 45 (3d Cir. 1990) (explaining that improper inducement by law enforcement may take the form of pleas based on sympathy or friendship). But see United States v. Ford, 918 F.2d 1343, 1348-49 (8th Cir. 1990) (finding that friendship with a confidential informant is not evidence of entrapment). Delgado's and Rosa-Valentín's testimonies also reflected that Officer I attempted to manipulate his way around potential targets' reluctance to participate in an Operation Guard Shack "part-time." As to Rosa-Valentín, Officer I told her to bring her children to the "part-time" because there was a pool and a tennis court in the apartment where it would take place. Concerning Delgado, she said that Officer I romantically seduced her until she gave in to his invitations to engage in a "part-time."

Furthermore, Rosa-Valentín's testimony supported the propensity prong of Delgado's entrapment defense. For example, Rosa-Valentín's testimony showed that Officer I's pursuit of potential Operation Guard Shack targets was not limited to corrupt

officers.  In this regard, she testified that Officer I persistently asked her for contact information of police officers, even though she told him she knew only officers seemingly involved in legitimate part-time work (her exact words on this were: "They worked at gas stations, that kind of thing").  Rosa-Valentín also testified that Officer I invited her to participate in a "part-time" herself, despite the fact that she had no criminal record, links to the drug-trafficking trade, or involvement with the police force.  Delgado testified similarly, stating that her untarnished criminal record shows that she had no inclination to engage in illegal activities before Officer I's month-long pursuit.  See Rodriquez, 858 F.2d at 815-16 (stating that the absence of a criminal record or known links to criminal activity could show the accused's lack of predisposition to engage in illegal conduct); see also United States v. Gamache, 156 F.3d 1, 10-11 (1st Cir. 1998) (same).

Notwithstanding the above, the government argues that "[t]he court correctly found [Rosa-Valentín's] testimony inadmissible under Rule 608(b), which only permits inquiry into prior conduct if the conduct is probative of the witness's character for truthfulness or untruthfulness."  But this argument fails for at least two reasons.

First, the language just quoted from the government's brief encompasses the entire extent of its argument before us on

Rule 608(b). We have stated many times that such a lackadaisical effort is insufficient to carry the day. United States v. Dellosantos, 649 F.3d 109, 126 n.18 (1st Cir. 2011); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Second, Rosa-Valentín's testimony fell out of Rule 608(b)'s reach, inasmuch as it supported Delgado's entrapment defense. See 28 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6113, at 47 (2d ed. 2012) ("Rule 608 does not grant discretion to admit or exclude evidence for any non-character purpose."). While it may be true that Rosa-Valentín's testimony incidentally called into question Officer I's character for truthfulness, without more, such an effect does not render the testimony inadmissable. United States v. Abel, 469 U.S. 45, 56 (1984) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case. It would be a strange rule of law which held that relevant, competent evidence which tended to show bias on the part of a witness was nonetheless inadmissible because it also tended to show that the witness was a liar.").

The government also argues that "the instances mentioned by Rosa-Valentín were improper collateral impeachment and inadmissible." See United States v. Cruz-Rodríguez, 541 F.3d 19, 30 (1st Cir. 2008) ("'It is well established that a party may not

-26-

present extrinsic evidence to impeach a witness by contradiction on a collateral matter.'" (quoting United States v. Beauchamp, 986 F.2d 1, 3 (1st Cir. 1993))). But the government's brief contains no explanation whatsoever as to why or how Rosa-Valentín's testimony constituted collateral evidence. Its argument in this regard was perfunctory at best. In fact, it was limited to the introductory remarks just quoted and a few parenthetical citations. See Dellosantos, 649 F.3d at 126 n.18 (stating that perfunctory, undeveloped arguments are deemed waived). All the same, we have already established that significant portions of Rosa-Valentín's testimony showed how Officer I performed as an Operation Guard Shack agent and thus provided support to Delgado's entrapment defense. Accordingly, Rosa-Valentín's testimony was anything but collateral. See Beauchamp, 986 F.2d at 4 (stating that the term "collateral evidence" refers to a matter which in "itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness" (internal quotation marks omitted)); see also United States v. Williamson, 202 F.3d 974, 979 (7th Cir. 2000) ("A matter is collateral if it could not have been introduced into evidence for any purpose other than contradiction." (internal quotation marks omitted)).

Lastly, the government attacks the admissibility of Rosa-Valentín's proffer under Fed. R. Evid. 404(b)(1). Rule 404(b)(1)

prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." According to the government, the Rule applies here because "Delgado . . . wanted to [use Rosa-Valentín's testimony] to show that because [Officer I] was bad in the past, he must have been bad in this case." In so arguing, the government appears to refer to the confessions of corrupt acts Officer I allegedly made to Rosa-Valentín. But our prior discussion shows that the scope of Rosa-Valentín's proffer went far beyond those admissions.[18]

To boot, we disagree with the view that Delgado's stated purpose in seeking Rosa-Valentín's testimony masked an effort to circumvent Rule 608(b).[19] In so ruling, the district court abused its discretion by relying on an incorrect interpretation of both the relevant facts and the applicable law. Moreover, we agree with

---

[18] The government's brief fails to address Delgado's contention that Rule 404(b)(1) has a so-called reverse evidence prong that permits the admission of Rosa-Valentín's testimony. Given our conclusion here, we need not reach this issue. Nevertheless, we note that, in the past, the government itself appears to have sanctioned the reverse evidence argument Delgado advances. See United States v. Stevens, 935 F.2d 1380, 1404 (3d Cir. 1991) ("[T]he government submits, the defense may introduce evidence [under Rule 404(b)] that the government induced others to commit crimes in order to show that the defendant was induced to commit the charged offense.").

[19] We recognize that our discussion does not exhaust the myriad of possibilities in which the Federal Rules of Evidence could affect the admissibility of Rosa-Valentín's testimony at trial. Our analysis is limited, as it must be, to the arguments the parties raise on appeal.

Delgado's proposition that Rosa-Valentín's proffered testimony would have corroborated pivotal elements of her entrapment defense. Because the government does not, and cannot, challenge such a proposition, we comfortably find that the government has not met its burden of showing that "it is highly probable that the [evidentiary] error did not affect the verdict." See Pridgen, 518 F.3d at 91. This finding mandates that Delgado's conviction be overturned.

Of course, nothing in this decision should be interpreted as an intimation on our part as to the merits of Delgado's entrapment defense. All that we decide today is that the district court erred when precluding Rosa-Valentín from testifying as part of Delgado's defense. Delgado cannot properly be convicted without having the opportunity to present to the jury admissible, material, and favorable testimony bearing on her defense.

B. Rivera's Challenge to the Special Jury Verdict Instructions

We now turn to the first of Rivera's several claims on appeal. Among other things, Rivera argues that the district court failed to properly instruct the jury that in answering a post-verdict "special" question regarding drug quantity, they needed to be sure of the quantity beyond a reasonable doubt. We agree.

1. Background

At sidebar, before the jury was sent to deliberate, Delgado's counsel asked the court to inform the jury that "the

-29-

amount and the type of drugs would be determined by the jury." The court emphatically refused. It retorted: "No, no, no, no, no. Not this case. We know it's seven kilos. I'm sorry. . . . It's seven kilos. We counted them on the video. There's nothing to be determined."[20] The initial jury instructions and verdict form thus left no role for the jury with respect to determining drug quantity. In fact, at that juncture, the court made no reference to quantity, explaining to the jury that the conspiracy count only had two elements:

> For you to find a defendant guilty of conspiracy, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt. First, that the agreement specified in the indictment and not some other agreement existed at least between two people to commit that crime. . . . Second, that each of the defendants willfully joined in that agreement.

No one objected, and the jury returned a guilty verdict on all counts.

The court then stated in open court that it would dismiss the jury unless the parties had any other motions. The government took the opportunity to request "a special jury [verdict] on the amount of narcotics involved in this case." The court initially refused, reasoning that photos of record showed the duffle bag containing the seven packages of purported cocaine. But the

---

[20] The video itself does not support the court's remarks. It shows only the four "bricks" the purported buyer placed on top of the coffee table.

prosecution insisted that the quantity issue was for the jury to determine beyond a reasonable doubt. Delgado's counsel initially resisted, stating that "[t]he verdict ha[d] been rendered." But, after a short colloquy with the government and the court, counsel agreed that the question was proper. The court acquiesced and immediately addressed the jury: "Members of the jury, the court has decided to ask you an additional question. Let me prepare a short question for you to answer. You have to go back and answer only this question. It's like another deliberation under the same terms and conditions."[21]

The court instructed the jury thereafter: "I want you to determine, answer an additional question that's going to be typed out, how much narcotics were involved in this case. Two choices, less than five kilograms of purported cocaine or more than five kilograms of purported cocaine." There were no trial objections to these jury instructions.

After a nineteen-minute deliberation, the jury returned

---

[21] Before submitting the special verdict form to the jury, the court asked the parties to comment on the following proposed jury question: "how much narcotics were involved in this case, less than five kilograms of purported cocaine[;] more than five kilograms of purported cocaine." Rivera's counsel objected on the basis that the record contained no evidence about the weight or amount of the purported drugs. But the court discarded the objection and sternly remarked: "Counsel, listen to me. Listen to me. That is a sentencing issue, not to be discussed today."

a verdict of "more than five kilograms of purported cocaine."[22]

    2. <u>Applicable Law and Analysis</u>

    a. <u>*Alleyne* Error Regarding the Jury Instructions</u>

Generally, we review challenges to the propriety of jury instructions <u>de novo</u>. <u>United States</u> v. <u>Whitney</u>, 524 F.3d 134, 138 (1st Cir. 2008). However, where, as here, a defendant fails to properly preserve an objection at trial, we review the record under the plain-error standard. <u>United States</u> v. <u>Medina-Martinez</u>, 396 F.3d 1, 8 (1st Cir. 2005); <u>see also</u> <u>United States</u> v. <u>Cotton</u>, 535 U.S. 625, 631-34 (2002) (applying plain-error review to an unpreserved <u>Apprendi</u> error); <u>United States</u> v. <u>Harakaly</u>, 734 F.3d 88, 94 (1st Cir. 2013) ("This court reviews unpreserved <u>Apprendi</u> errors for plain error and preserved <u>Apprendi</u> errors for harmless error. Since <u>Alleyne</u> is an extension of the <u>Apprendi</u> doctrine, the same standards should apply to <u>Alleyne</u> errors." (internal citation omitted)).[23]

---

[22] Consistent with the district court's instruction, the form given to the jury was titled, "Special Verdict," and included the question "[h]ow much narcotics were involved in this case." Two options were given: "less than 5 kilograms of purported cocaine," or "more than 5 kilograms of purported cocaine." The jury returned the form with an "x" marked beside the latter option.

[23] Although an <u>Apprendi</u> issue -- namely, that drug quantity should be determined by the jury and not the judge -- was raised at trial by Delgado's counsel as well as by the government (prompting the court to require the jury to answer the special verdict question), Rivera concedes that he did not raise the <u>instructional</u> issue at trial. Rivera did in fact object to the special verdict question, but only on the basis of the lack of evidence as to the weight or amount of the purported cocaine. There was no trial objection

The plain-error standard requires an initial showing of three elements: (1) that an error occurred; (2) that the error was clear or obvious; and (3) that the error affected substantial rights or the outcome of the case. See United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013); United States v. Rodriguez, 675 F.3d 48, 64 (1st Cir. 2012); Whitney, 524 F.3d at 140 (citing United States v. Olano, 507 U.S. 725, 732-34 (1993)). Even if those requirements are satisfied, however, we have the discretion to affirm the ruling if "'the error does not distort the fairness or integrity of the lower court proceedings in some extreme way.'" Rodriguez, 675 F.3d at 64 (quoting United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010)). "This multi-factor analysis makes the road to success under the plain error standard rather steep; hence, reversal constitutes a remedy that is granted sparingly." United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013). This appeal, however, falls within the realm of those infrequent cases in which reversal is warranted.

As stated above, Rivera premises his challenge on the district court's failure to instruct the jury that the government needed to prove drug quantity beyond a reasonable doubt. The reasonable-doubt standard, stemming from the Fifth Amendment's Due

---

regarding the burden of persuasion and the failure to instruct the jury that drug quantity needed to be determined beyond a reasonable doubt. Accordingly, Rivera concedes in his supplemental brief that the plain-error standard applies to the Alleyne issue concerning the jury instructions.

Process Clause, is interwoven with the Sixth Amendment's promise of a jury verdict.  See Sullivan v. Louisiana, 508 U.S. 275, 278 (1993) ("It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt.").  It is therefore well settled that, in a criminal case, a vital part of a judge's responsibilities is to provide the "reasonable doubt" charge to the jury.  See Dunn v. Perrin, 570 F.2d 21, 25 (1st Cir. 1978) (citing In re Winship, 397 U.S. 358, 364 (1970)).  Indeed, where a trial judge fails to instruct the jury that all the elements of the charged crime must be proven beyond a reasonable doubt, a finding of reversible plain error may be proper.  See United States v. Hellman, 560 F.2d 1235, 1236 (5th Cir. 1977); United States v. Howard, 506 F.2d 1131, 1133-34 (2d Cir. 1974).

Prior to the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), this court did not consider "drug quantity" to be an element of the offense for purposes of the penalties prescribed in 21 U.S.C. § 841(b)(1).  See, e.g., United States v. Eirby, 262 F.3d 31, 36 (1st Cir. 2001).  Rather, "drug quantity" was considered to be a "sentencing factor" that the sentencing judge could determine by a preponderance of the evidence.  See id. (explaining that pre-Apprendi, the specific drug quantities in § 841(b)(1)'s penalty scheme did not have to be

charged in the indictment or found by the jury).

In _Apprendi_, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Two years later, in _Harris_ v. _United States_, 536 U.S. 545 (2002), the Supreme Court declined to extend the _Apprendi_ rule to facts that increase only the mandatory minimum sentence. _See_ _id._ at 565-69. While this appeal was pending, however, the Supreme Court expressly overruled _Harris_ in _Alleyne_, holding that any fact that increases the mandatory minimum is an element that must be submitted to the jury and proved beyond a reasonable doubt. _See_ _Alleyne_, 133 S. Ct. at 2155, 2162-63.[24] Here, _Alleyne_ applies retroactively to Rivera's claims on appeal. _See_ _Griffith_ v. _Kentucky_, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final . . . ."); _Pena_, 2014 WL 448439, at *6 ("The _Alleyne_ rule applies to cases pending on direct appeal at the time it was decided."); _United States_ v. _Doe_, No. 12-2304, 2013 WL 6697824, at *12 (1st Cir. Dec. 20, 2013) ("As _Alleyne_ was decided during the pendency of [the defendant's] appeal, we apply it here."); _Harakaly_, 734 F.3d at 94

---

[24] We examine the development of the Supreme Court's jurisprudence from _Apprendi_ to _Alleyne_ in more detail in _United States_ v. _Pena_, No. 12-2289, 2014 WL 448439, at *4-*6 (1st Cir. Feb. 5, 2014).

n.4 (same).

On Counts One and Two, Rivera was convicted of conspiring and attempting to possess cocaine with the intent to distribute it. See 21 U.S.C. §§ 841(a)(1), 846. Section 841 prohibits, among other things, possession with intent to distribute a controlled substance. Id. § 841(a)(1). In § 841, subsection (b) prescribes the penalties for violations of subsection (a). Id. § 841(a)-(b). For possession with intent to distribute cocaine, paragraph § 841(b)(1) sets out three different ranges of prison terms, depending on the quantity of cocaine involved. Id. § 841(b)(1)(A)-(C).

For an indeterminate quantity of cocaine, there is no mandatory minimum term of imprisonment, and the maximum term is twenty years. Id. § 841(b)(1)(C). If the violation involves 500 grams or more of a substance containing cocaine, the permissible prison terms range from a minimum of five years to a maximum of forty years. Id. § 841(b)(1)(B). If the violation of § 841(a) involves five kilograms or more of a substance containing cocaine, as charged in the indictment here, then the highest statutory range of sentences applies: the mandatory minimum is ten years' imprisonment, and the maximum term is life in prison. Id. § 841(b)(1)(A).

Under Alleyne, then, the "drug quantity" question in this case -- whether the offense involved at least five kilograms of a

substance containing cocaine -- aggravated the statutory sentencing range, and was thus an element of the aggravated crime that was required to be determined by the jury beyond a reasonable doubt. See Alleyne, 133 S. Ct. at 2161 ("A fact that increases a sentencing floor, thus, forms an essential ingredient of the offense . . . . [T]he core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury.").

In this case, the jury determined that more than five kilograms of cocaine were involved, triggering the aggravated sentencing range (ten years to life) under subparagraph (A). See 21 U.S.C. § 841(b)(1)(A). Based on this finding, the district court sentenced Rivera to the mandatory minimum of ten years' imprisonment. See id. Although the jury returned a special verdict form indicating their finding that "more than 5 kilograms of purported cocaine" were involved in the case, however, the trial judge failed to instruct the jury that they were required to make this special finding beyond a reasonable doubt. Nor can we assume that the jury likely made such an inference, given that they were never instructed that "drug quantity" was an element of any of the offenses of conviction.

Nevertheless, the government argues that the special jury verdict and its accompanying instructions cured the instructional defect. Specifically, the government posits that the initial jury

instructions unequivocally established the government's duty to prove each element of the underlying offense beyond a reasonable doubt.  The government thus reasons that "the district court's [post-verdict special] instruction that deliberation would be under the same 'terms and conditions' also called on the jury to accord drug quantity the same treatment as the other elements of the offense, . . . which comported with Alleyne."  This argument is flawed for at least two reasons.

First, it presumes that the jurors understood that the court posed the special question because "drug quantity" was an element of the underlying crime.  Nothing in the record supports that presumption.  The instructions accompanying the special question were tersely given, with the court only stating that the jury would be asked to answer another question.  The court neither explained why the special question was being asked nor how the jury's answer would bear in the case.  Moreover, the special jury verdict form was submitted to the jurors after they had: (1) deliberated pursuant to the initial jury instruction; (2) rendered a guilty verdict; and (3) been told by the court that they were about to be dismissed.  Having discharged their duties as initially explained by the court, and without the benefit of any guidance as to the reasons for or relevance of the new question being asked, the jurors had no cause to understand the special verdict question as involving another element of the offense.

Indeed, given the timing and manner in which the question was presented, the jurors understandably may have failed to appreciate that the additional question represented something more than an inconsequential afterthought standing in the way of heading home.  With nothing to discredit the reasonable inference that the jury placed little weight on the "special" question, we cannot find that they were sufficiently put on notice of its critical import to the case.  Cf. United States v. DeMasi, 40 F.3d 1306, 1317 (1st Cir. 1994) (framing the dispositive inquiry in a challenge to a district court's "beyond reasonable doubt" charge as "whether there is a reasonable likelihood that the jury understood the instructions to allow [a] conviction based on proof insufficient to meet the [beyond-a-reasonable-doubt] standard" (internal quotation marks omitted)).

Second, the government's argument places undue weight on the phrase "under the same terms and conditions."  In the government's view, this phrase properly conveyed to the jury that its post-verdict deliberation required a determination that the government had proven drug quantity beyond a reasonable doubt.  The government, however, fails to articulate how such a broad phrase conveyed such a specific message.

To be sure, the initial jury instructions properly conveyed to the jury that it needed to find all the elements of the underlying crime beyond a reasonable doubt.  But, as stated above,

and consistent with the Supreme Court precedent applicable at the time of trial, no one told the jury that "drug quantity" was an element of the crime. Indeed, even the government's appellate attorneys insist in their brief that "[d]rug quantity was not an element of the offense here." Yet the government argues, in the same breath, that the jury would have necessarily understood that the special verdict question was required to be determined beyond a reasonable doubt, based on the interplay of two instructions: (1) the initial instruction that the jury must find the defendants guilty beyond a reasonable doubt for "any essential element of a crime charged," and (2) the subsequent instruction that the special verdict question was "like another deliberation under the same terms and conditions." To accept such an inconsistent argument would strain credulity.

Similarly, the district court judge -- after giving the instructions at issue, and immediately after the jury left the courtroom to consider the special verdict question -- stated to counsel that: "I can understand the Apprendi concerns . . . but in a case like this one . . . I don't think you need a special verdict. I'm doing it for the simple purpose of pleasing you, if you will. I don't think you need that at all." If the district judge himself -- consistent with the then-governing case law -- did not believe that "drug quantity" was an element required to be proved to the jury beyond a reasonable doubt, and did not

explicitly instruct the jury otherwise, then we cannot presume that the jury made this inferential leap on its own initiative.

The initial jury instructions involved many different "terms and conditions," spanning twenty pages of the trial transcript. The government has failed to identify a single record entry that would allow us to properly link the phrase "under the same terms and conditions" back to the beyond-a-reasonable-doubt standard explained to the jury in the initial instructions. Such imprecise language was insufficient to do the heavy lifting necessary to protect Rivera's Sixth Amendment right.

The government relies on United States v. Avilés-Colón, 536 F.3d 1 (1st Cir. 2008), and United States v. Pérez-Ruiz, 353 F.3d 1 (1st Cir. 2003), for the proposition that a verdict form need not explicitly state that the beyond-a-reasonable-doubt-standard governs the verdict, if the jury instructions sufficiently conveyed the same information. This reliance is misplaced. On the contrary, both cases weigh heavily against the government.

In Avilés-Colón, we rejected the proposition that a verdict form needed to explicitly state that the beyond-a-reasonable-doubt standard would govern the jury's deliberations, when the jury instructions at issue were "suitably focused" and properly "conveyed the need to make the finding with that level of certainty." 536 F.3d at 27. Unlike this case, however, the instruction in Avilés-Colón adequately framed "drug quantity" as an

essential element of the case and made the necessary linkage with the reasonable-doubt standard. The relevant portion of the instruction speaks for itself:

> For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt: . . . fourth, that the quantity of the substance was at least one kilogram or more of heroin, five kilograms or more of cocaine, and a detectable amount of marijuana.

Id. at 26 n.20.

Pérez-Ruiz provides no better help for the government, as it also makes plain that jury instructions must provide a clear linkage between the beyond-a-reasonable-doubt standard and the proof that must be marshaled in connection with the elements of the crime. See Pérez-Ruiz, 353 F.3d at 16, 19-20 (vacating the appellant's sentence, in the context of an enhanced sentencing range for a particular quantity of drugs, when the jury instructions failed to "forge the necessary link" between the "drug types and quantities" alleged in the indictment and "the requirement that these facts be proven beyond a reasonable doubt").

The instructional error in this case, moreover, is not mitigated by the fact that Rivera's ten-year sentence happened to also fall within the statutory range (zero to twenty years of imprisonment) for an indeterminate quantity of cocaine. See Alleyne, 133 S. Ct. at 2162 (reasoning that when a fact "aggravates the legally prescribed range of allowable sentences, it constitutes

-42-

an element of a separate, aggravated offense that must be found by the jury, regardless of what sentence the defendant might have received if a different range had been applicable").  The Alleyne Court emphasized that whether a defendant could have received the same sentence without the aggravating fact "is no answer" and "is beside the point."  See id. ("Indeed, if a judge were to find a fact that increased the statutory maximum sentence, such a finding would violate the Sixth Amendment, even if the defendant ultimately received a sentence falling within the original sentencing range (i.e., the range applicable without that aggravating fact).").

Under these circumstances, reversal is warranted even on plain-error review.[25]  Given Alleyne's clear holding that facts which increase mandatory minimum sentences must be submitted to the jury and found beyond a reasonable doubt, see id. at 2163, it was an obvious error to fail to properly instruct the jury that they were required to determine the special verdict question beyond a reasonable doubt.  And since the district court sentenced Rivera to the enhanced mandatory minimum sentence of ten years -- based on an aggravating fact (drug quantity) that was not found beyond a reasonable doubt, and for which scant evidence was presented -- the

---

[25]  See Rodriquez, 675 F.3d at 64.  As we have previously noted, "[i]t may seem strange to talk about plain error, given how Alleyne came down after [the] defendants argued these consolidated appeals to us."  United States v. Acosta-Colón, No. 10-1076, 2013 WL 6654386, at *15 n.12 (1st Cir. Dec. 18, 2013).  Nonetheless, we apply Alleyne's holding retroactively under the plain-error standard.  See id.

error affected Rivera's substantial rights and the outcome of his case.[26]

Likewise, we cannot say that the error did not "'distort the fairness or integrity of the lower court proceedings in some extreme way.'" See Rodriguez, 675 F.3d at 64 (quoting Kinsella, 622 F.3d at 83). The evidence on the "drug quantity" question here was far from overwhelming and uncontroverted. See Cotton, 535 U.S. at 631-33 (applying the fourth prong of the plain-error test, and stating that where evidence of a statutory element -- such as drug quantity -- is "'overwhelming'" and "'essentially uncontroverted,'" there is "'no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings'" (quoting Johnson v. United States, 520 U.S. 461, 470 (1997)) (internal quotation marks and alteration omitted)); cf. Harakaly, 734 F.3d at 95-97 (holding that an Alleyne error was harmless when "the evidence of the triggering drug quantity was overwhelming"); Pérez-Ruiz, 353 F.3d at 17-20 (vacating the appellant's sentence after concluding that the government failed to

--------

[26] Indeed, at sentencing, the district court acknowledged that the statutory minimum may be "high" and representative of "an imperfect system," but stated that the court was nonetheless bound by the minimum. The court remarked to Rivera's counsel that: "If you find a case that says I can do away with the statutory minimum," or any case saying that "I can do what I want other than the statutory minimum, we'll deal with it. But you know very well that the statutory minimum is the statutory minimum. It's a fact." Later, the court explicitly stated that it was sentencing Rivera "to the statutory mandatory minimum on the drug count, which is 120 months."

show "overwhelming evidence" of drug quantity at trial and thus failed to demonstrate that the Apprendi error was harmless).

While the exhibits in this case include photographs of seven "bricks" and a duffel bag, the video of the transaction shows only the four "bricks" that the purported buyer placed on top of the coffee table.  The video is not clear as to whether Rivera saw or handled more than four "bricks."  There was no discussion on the video or in the preceding phone calls as to the quantity of drugs to be transacted, and there was no testimony presented that Rivera or Delgado were told the quantity of purported drugs involved.  The "bricks" involved in this case were fake drugs, and no evidence was presented as to their actual weight.  For example, if the seven bricks actually weighed 0.7 kilograms each, their total weight would be 4.9 kilograms -- just shy of the five kilograms necessary for conviction of the aggravated offense.  Therefore, as in Pérez-Ruiz, this is not "a case in which the evidence tying the defendant to the charged conspiracy involved drugs that were indisputably in excess of the requisite amounts."  See Pérez-Ruiz, 353 F.3d at 19.

Under these circumstances, we do not consider the evidence of the drug quantity involved to be "overwhelming" or "essentially uncontroverted."  See Cotton, 535 U.S. at 633. Compare Harakaly, 734 F.3d at 95-97 (finding the drug-quantity evidence to be overwhelming when "[t]he delivery that the police

intercepted, taken alone, was nearly four times the triggering amount," and when the defendant himself "acknowledged responsibility for a quantity of drugs that far exceed[ed] the triggering amount"), with Pérez-Ruiz, 353 F.3d at 17-20 (evidence that the conspiracy involved at least five kilograms of cocaine was not overwhelming when "actual drug quantities" were mentioned "only three times during the trial" -- including testimony from one witness that he supplied the drug ring with more than fifteen kilograms of cocaine, and testimony from a DEA agent that he estimated that the drug ring distributed "over 150 kilograms of cocaine").

In sum, the record supports Rivera's contention that the district court plainly erred in failing to instruct the jury that the drug quantity question required a finding beyond a reasonable doubt. In light of this instructional error, under Alleyne, Rivera's sentence cannot stand. See Alleyne, 133 S. Ct. at 2163-64.

b. Remedy

To the extent that Rivera claims entitlement to a new trial altogether in light of this error, however, he is mistaken. The district court's instructional error invalidates Rivera's ten-year mandatory minimum sentence under the enhanced penalty set out in § 841(b)(1)(A), but it does not call into question the

validity of his underlying conspiracy and attempt convictions under §§ 846 and 841(a).

Neither conspiracy nor attempt includes "drug quantity" as an element of the core offense. Under § 846, any person who either attempts or conspires to commit a drug offense shall be subject to the same penalties as the target offense. 21 U.S.C. § 846. We have previously held that a conviction for criminal attempt under § 846 requires proof of only two elements: "(1) an intent to engage in criminal conduct and (2) conduct constituting a 'substantial step' toward the commission of the substantive offense that strongly corroborates the criminal intent." United States v. Dworken, 855 F.2d 12, 17 (1st Cir. 1988) (emphasis omitted); United States v. Rivera-Sola, 713 F.2d 866, 869 (1st Cir. 1983).

To secure a conspiracy conviction under § 846, the government must prove that: "(1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy." United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013) (citing Dellosantos, 649 F.3d at 116). Accordingly, the government need not prove a particular drug quantity in order to secure a conviction for the core offenses of conspiracy or attempt to commit a drug crime. See, e.g., United States v. Daniels, 723 F.3d 562, 564, modified in part on reh'g, 729 F.3d 496 (5th Cir. 2013)

-47-

("[D]rug quantity is not an essential element of a conspiracy offense."); <u>United States</u> v. <u>Yeje-Cabrera</u>, 430 F.3d 1, 12-13 (1st Cir. 2005) (rejecting the argument "that unless the jury has found a specific quantity of drugs, a defendant cannot be guilty of conspiracy"); <u>United States</u> v. <u>Gómez-Rosario</u>, 418 F.3d 90, 104 (1st Cir. 2005) ("No specific drug quantity needs to be proven for a jury to convict a defendant of conspiracy to possess with intent to distribute.").

Therefore, under <u>Apprendi</u> and <u>Alleyne</u>, drug quantity is an element for purposes of the aggravated penalties under §§ 841(b)(1)(A) and 841(b)(1)(B), but it is not an element necessary for conviction of the core offenses under §§ 841(a) and 846.  See <u>Daniels</u>, 723 F.3d at 573 ("[W]here a defendant may be subject to enhanced statutory penalties because of drug quantity or type, the requisite fourth 'element' under <u>Apprendi</u> is not a formal element of the conspiracy offense."); <u>United States</u> v. <u>González-Vélez</u>, 466 F.3d 27, 35 (1st Cir. 2006) ("The quantity of drugs is not an element of conspiracy under § 846, nor is it an element of the underlying controlled substances offense under § 841(a)(2)."); <u>United States</u> v. <u>Collins</u>, 415 F.3d 304, 314 (4th Cir. 2005) ("Guilt of the substantive offense defined in § 841(a) is not dependent upon a determination of the amount or type of narcotics distributed."); <u>United States</u> v. <u>Toliver</u>, 351 F.3d 423, 430 (9th Cir. 2003), <u>abrogated on other grounds by</u> <u>Blakely</u> v. <u>Washington</u>,

542 U.S. 296 (2004) ("[D]rug quantity and type need only be treated as 'functional equivalent[s]' of formal elements of an offense when a particular drug type or quantity finding would expose a defendant to an increased maximum statutory sentence, as they do not constitute formal elements of separate and distinct offenses under section 841(b)(1).").

In Alleyne itself, the defendant was charged, among other things, with using or carrying a firearm in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A). Alleyne, 133 S. Ct. at 2155. That provision carries a default minimum of five years' imprisonment. 18 U.S.C. § 924(c)(1)(A)(i). However, it also includes two enhanced penalties if additional aggravating facts are found: a minimum of seven years of imprisonment "if the firearm is brandished," and a minimum of ten years "if the firearm is discharged." Id. § 924(c)(1)(A)(ii)-(iii). The jury indicated on the verdict form that Alleyne had used or carried the firearm, but did not indicate that the gun was "brandished." Nonetheless, the district court found by a preponderance of the evidence that Alleyne had brandished the gun, and thus sentenced him to seven years' imprisonment. The Supreme Court held that the Sixth Amendment requires that the sentencing enhancement for brandishing the gun must be found by the jury beyond a reasonable doubt. Alleyne, 133 S. Ct. at 2163-64. Despite the fact that "brandishing" was an "element" not found by the jury beyond a

reasonable doubt, however, the Court did not vacate Alleyne's conviction.  Rather, it "remand[ed] the case for resentencing consistent with the jury's verdict."  Id. at 2164.

Thus, Alleyne in effect recognizes a distinction between "core crimes" and "aggravated crimes."  See id. at 2161.  In order to subject a defendant to the enhanced penalty of an aggravated crime, the aggravating element must be submitted to the jury and found beyond a reasonable doubt.  See id. at 2161-63.  Failure to do so invalidates the conviction as to the aggravated crime, but does not necessarily undermine the defendant's conviction for the core crime.  See id. at 2161-64 (vacating the defendant's sentence for the "aggravated crime" of brandishing a firearm -- when that aggravating element was found by the judge rather than the jury -- and remanding for resentencing consistent with the jury's verdict of guilty on the "core crime" of using or carrying a firearm); see also United States v. McCloud, 730 F.3d 600, 604 (6th Cir. 2013) ("[T]he discussion in Alleyne to the effect that brandishing is an element rather than a sentencing factor was for purposes of the Court's Sixth Amendment analysis; it did not mean that Alleyne's conviction had to be reversed.").

Here, as in Alleyne, the enhanced penalty for the aggravated offense is unavailable due to the absence of a beyond-a-reasonable-doubt jury determination on the aggravating element; however, the convictions on the core offenses remain sound.

Accordingly, Rivera's valid attempt and conspiracy convictions, without more, subject him to the default statutory range of penalties under § 841(b)(1)(C), regardless of the drug quantity involved.

When faced with similar Apprendi and Alleyne claims, circuit courts have likewise reasoned that a successful appellant is not entitled to a new trial, but rather is only entitled to resentencing under the default penalty provision, § 841(b)(1)(C). See, e.g., Daniels, 723 F.3d at 572 (concluding, post-Alleyne, that the government's failure to prove drug quantity under § 841(b) does not undermine conspiracy convictions under §§ 846 and 841(a), but rather "only affects the sentence"); United States v. Kelly, 519 F.3d 355, 363 (7th Cir. 2008) ("[T]he remedy for a failure of proof that a defendant possessed a particular amount or type of cocaine would not be to grant him a judgment of acquittal or a new trial, but rather to remand for re-sentencing subject to the default statutory maximum term of twenty years."); Gómez-Rosario, 418 F.3d at 108-09 (affirming the defendant's conviction, but remanding for resentencing when the district court had improperly considered at sentencing facts not found by the jury, including the amount of heroin involved); Collins, 415 F.3d at 314 ("Because the conviction of conspiracy to violate § 841(a) is sound, remanding for a new trial is not the appropriate remedy."); Pérez-Ruiz, 353 F.3d at 17 ("Because the issue of drug type and quantity was not properly

submitted to the jury, the statutory maximum remained at 20 years." (citing 21 U.S.C. § 841(b)(1)(C))); Toliver, 351 F.3d at 431 ("[A]lthough the government failed to prove any of the specific drug quantities or that cocaine base/crack was involved in the conspiracy, the defendants were not entitled to a judgment of acquittal; rather, the district court was restricted in the maximum sentence it could impose."); cf. Pena, 2014 WL 448439, at *9 (collecting cases that found error under Apprendi and Alleyne and remanded to the district court for resentencing).

The determination that Rivera is not entitled to a retrial does not end our inquiry into the proper remedy, however. At a minimum, under Alleyne, Rivera is entitled to resentencing under § 841(b)(1)(C)'s default sentencing range. But Rivera's interests are not the only interests implicated here. In light of the reversal for procedural error, the government also has an interest in potentially retrying Rivera for the aggravated crime charged in the indictment. Cf. United States v. Tateo, 377 U.S. 463, 466 (1964) ("Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.").

-52-

Because the <u>Alleyne</u> error here was an instructional error, the Double Jeopardy Clause does not prohibit retrial. <u>See</u> U.S. Const. amend. V.; <u>Burks</u> v. <u>United States</u>, 437 U.S. 1, 14-15 (1978) (noting that the Double Jeopardy Clause bars retrial for reversals due to insufficient evidence, but not reversals for procedural trial errors such as incorrect jury instructions); <u>United States</u> v. <u>Lanzotti</u>, 90 F.3d 1217, 1220-24 (7th Cir. 1996) (same); <u>see also</u> <u>Tateo</u>, 377 U.S. at 466 (explaining that where procedural defects at trial constitute reversible error, "the practice of retrial serves defendants' rights as well as society's interest"). Accordingly, we believe the proper remedy is that employed by the Fourth Circuit in <u>Collins</u>, which involved a failure to submit the question of individualized drug quantity to the jury. <u>See</u> <u>Collins</u>, 415 F.3d at 313-15.

The jury in <u>Collins</u> found the defendant guilty of a § 846 conspiracy to distribute crack cocaine in violation of § 841(a). <u>Id.</u> at 314. The <u>Collins</u> district court, however, erred by failing to properly instruct the jury regarding the determination of drug quantity; this error affected the appropriate sentencing range under § 841(b). <u>Id.</u> at 312-15. Since "[g]uilt of the substantive offense defined in § 841(a) is not dependent upon a determination of the amount or type of narcotics distributed," the Fourth Circuit held that the defendant's conspiracy conviction remained valid. <u>Id.</u> at 314. On that basis, the defendant was not entitled to a

retrial.  Id.  However, the Fourth Circuit further reasoned that it would be inconsistent with the Sixth Amendment and Apprendi to remand the case and permit the district court upon resentencing to determine the quantity of cocaine for purposes of the penalties outlined in § 841(b).  Id.

For those reasons, the Fourth Circuit withheld judgment on the conspiracy count, giving the government thirty days to request that the court order one of two remedies: (1) affirm the conspiracy conviction and remand for resentencing under the default penalty provision set out in § 841(b)(1)(C), or (2) reverse the conspiracy conviction and remand for a new trial.  Id. at 315, 317. In analogous contexts, our sister circuits have at times employed the same remedy, giving the government the option to consent to resentencing under a lesser sentencing range, in lieu of a remand for a new trial.  See United States v. Garcia, 37 F.3d 1359, 1371 (9th Cir. 1994), receded from on other grounds by United States v. Jackson, 167 F.3d 1280 (9th Cir. 1999); United States v. Orozco-Prada, 732 F.2d 1076, 1084 (2d Cir. 1984); Brown v. United States, 299 F.2d 438, 440 (D.C. Cir. 1962).

We therefore will withhold judgment as to the conspiracy and attempt counts for thirty days, during which time the government can request either (1) that we affirm Rivera's convictions and remand for resentencing under § 841(b)(1)(C) -- for which there is no mandatory minimum term of imprisonment, and a

-54-

statutory maximum of twenty years -- or (2) that we vacate Rivera's convictions and remand for a new trial, allowing the question of drug quantity to be properly submitted to a jury.

C. Rivera's Remaining Challenges

Rivera also lodges a number of other challenges to his conviction. Because Rivera is not entitled to a new trial on the basis of the Alleyne error discussed above, we must consider the additional issues that he raises on appeal: (1) that the district court abused its discretion in denying a trial continuance, thus violating Rivera's right to a fair trial and effective assistance of counsel; (2) that the denial of a continuance deprived Rivera of effective assistance of counsel at voir dire, abrogating his right to a fair and impartial jury; and (3) that a series of evidentiary errors cumulatively undermined Delgado's right to a fair trial. Each of these contentions are examined in turn.

1. The Denial of a Trial Continuance

Rivera argues that the district court abused its discretion in refusing to grant a brief continuance of the trial date, and that this refusal violated his rights to a fair trial and effective assistance of counsel. Although we are persuaded that several factors weighed strongly in favor of granting the requested continuance, we find no prejudice and thus ultimately decline to grant Rivera relief on this issue.

a. <u>Background</u>

The defendants were indicted on September 9, 2010. The district court appointed Attorney Ramon L. Garay-Medina as Rivera's counsel on October 19, 2010. The court held two status conferences with counsel in the case: the first conference was held on November 2, 2010, during which the court scheduled the final status conference for November 16, 2010. At that final status conference, the court scheduled the jury trial to begin three weeks later, on December 7, 2010. On Friday, December 3, 2010, the court advanced the trial date by one day, rescheduling trial for 9:00 a.m. on Monday, December 6, 2010. On that same Friday before trial, the government filed a motion <u>in</u> <u>limine</u> to preclude the defendants from (1) alluding to an entrapment defense during opening statements, without first making a proffer of "some hard evidence" supporting both elements of the entrapment defense, and (2) making any arguments aimed at jury nullification. According to the record, the district court neither set a deadline for a response from the defense nor entertained oral argument on the government's motion, which the court granted -- without explanation -- shortly before trial on December 6, 2010.

Early in the morning on the day of trial, Rivera's counsel filed an "emergency motion" for a one-week continuance so as "to allow completion of the investigation, and/or preparation for trial." In that motion, counsel complained that at the final

status conference held November 16, 2010, the court scheduled trial for December 7, 2010, despite the protestations of "[b]oth attorneys" that "they needed more time to adequately prepare for this trial." Additionally, the motion described a number of other criminal trials and cases for which Rivera's counsel was then responsible. The motion noted that on December 3, 2010 -- the Friday preceding the Monday trial -- the government provided significant impeachment evidence to the defendants, amounting to "more than 600 pages of documentation (including sanitized reports that affect the investigation in preparation for trial)."[27] Counsel asserted that he worked "in preparation for trial during the whole weekend," but that he "ha[d] not been able to complete reviewing the additional material provided." Rivera suggested that the government would not be prejudiced by a one-week delay, given that the government "had years to investigate these cases, and prepare them for trial." The motion also sought a court order requiring

---

[27] Rivera's appellate brief clarified that this production included 689 pages of documents that were material to the defense (the "Brady/Giglio materials"), which the government was required to disclose to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). Rivera notes that the disclosure included: (1) 509 pages of payment records for Officers I and II; (2) eighteen pages of redacted FBI reports "about an investigation into a stolen car and gun ring among [Puerto Rico] undercover police, indicating that it found [Officer II]'s version of the events less than reliable"; and (3) a 162-page Puerto Rico police file of misconduct investigations against Officer I. These investigations of Officer I included two investigations from 2000, one from 2002, and a case filed in 2010 that arose from his role as an undercover agent in 2006.

the government to provide Rivera with unredacted versions of the reports disclosed on December 3, 2010.

Immediately after the case was called for trial on December 6, 2010, counsel for the defense asked to approach the bench. Rivera's counsel informed the court that he had filed a motion to continue earlier that morning. It is apparent from the transcript that the district court had not read Rivera's motion and had no knowledge of the government's Friday-afternoon disclosures.[28] Rivera's counsel was given a brief opportunity to explain that despite working all weekend, he and his client were not able to complete discussions of the Brady/Giglio documents provided to the defense by the government on Friday. Counsel noted that "[f]or example, there is information involving the confidential services, that there are complaints before the Supreme Court of Puerto Rico for fabricating cases against people." Without further discussion, the court immediately replied:

> Well, let me say this: We are not going to cross that bridge before we get there. If there is an issue, a real issue that surfaces in the middle of trial that requires me to deal with it and give you whatever remedy we

---

[28] The district court's responses indicated not only that it had failed to read the motion and consider the arguments raised therein, but also that it was not even aware that such a motion had been filed. The court inquired, "What are the circumstances? When was the motion filed?" The court repeated the question "[w]hat are the circumstances?" two more times, and also asked "What materials are we talking about? What is it you discovered? What is it that you discovered late?"

> need, we'll deal with it. But a continuance
> is out of the question.

Given the perfunctory nature of the in-court discussion on this issue, and without the benefit of having read Rivera's motion, the district court denied the continuance without first learning the scope, volume, or precise nature of the disclosed documents. Shortly thereafter, the court addressed the potential jurors and began the process of selecting a jury.

### b. Applicable Law and Analysis

Trial courts are granted broad discretion in scheduling trials and ruling on motions for continuances. United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013). While that discretion is limited by a defendant's constitutional rights to testimony by defense witnesses and effective assistance of counsel, United States v. Orlando-Figueroa, 229 F.3d 33, 39-40 (1st Cir. 2000), "'only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.'" Maldonado, 708 F.3d at 42 (quoting Morris v. Slappy, 461 U.S. 1, 11-12 (1983)). Accordingly, a district court's denial of a motion to continue trial is reviewed for abuse of discretion. United States v. Rosario-Otero, 731 F.3d 14, 18 (1st Cir. 2013). Under this standard, we will not disturb such a decision if reasonable minds could disagree about the proper ruling. See Maldonado, 708 F.3d at 42.

In evaluating a denial of a continuance, we consider "'the reasons contemporaneously presented in support of the request for the continuance.'" Rosario-Otero, 731 F.3d at 18 (quoting West v. United States, 631 F.3d 563, 568 (1st Cir. 2011)). We may also consider a number of other relevant factors, including: the amount of time needed for preparation compared to the actual time available; how diligently the movant used the time available, and whether the movant contributed to his or her perceived predicament; the complexity of the case; other available assistance; the probable utility of a continuance; the extent of any inconvenience to others (including the court, witnesses, and the opposing party); and the likelihood of injustice or unfair prejudice resulting from the denial of a continuance. Id.; West, 631 F.3d at 568 (citing United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995)). We consider this final factor to be essential, overturning the denial of a continuance only when the movant identifies specific, concrete ways in which the denial resulted in "substantial prejudice" to his or her defense. See United States v. Pacheco, 727 F.3d 41, 45 (1st Cir. 2013); Maldonado, 708 F.3d at 42; United States v. Espinal-Almeida, 699 F.3d 588, 615 (1st Cir. 2012); United States v. Rodriguez-Marrero, 390 F.3d 1, 22 (1st Cir. 2004); Saccoccia, 58 F.3d at 770.

Rivera complains that the abbreviated trial schedule left his counsel only twelve work days to prepare for trial.[29] At that time, his trial counsel was responsible for eleven ongoing criminal cases before the district court, ten of which were older than Rivera's case, and six of which were pending trial. Rivera argues that the hurried trial schedule and the denial of his motion for a one-week continuance violated his rights to a fair trial and effective assistance of counsel. In Rivera's view, three developments occurred on December 3, 2010 (the Friday before trial) that increased the prejudice of this denial: (1) the trial court advanced the trial date by one day, from Tuesday, December 7 to Monday, December 6; (2) the government filed a motion in limine seeking to prohibit the defense from alluding to an entrapment defense or a jury nullification argument; and (3) that afternoon, the government delivered a nearly 700-page ream of partially-redacted Brady/Giglio materials to the defense.[30]

---

[29] As previously noted, on November 16, 2010, the district court held the second and final status conference in the case. At that status conference, the court first set a date for trial: December 7, 2010 -- just three weeks later. Rivera argues that the court imposed this date despite protestations from both defense counsel that they needed more time to prepare for trial. Due to the Thanksgiving holiday, and the one-day advancement, the schedule left Rivera only twelve business days to prepare.

[30] Such materials are required to be disclosed to the defense when the government has in its possession evidence, including impeachment evidence, that is material to either guilt or punishment. See Giglio, 405 U.S. at 154; Brady, 373 U.S. at 87. The materials disclosed by the government included significant potential impeachment evidence concerning Officers I and II -- two

Rivera argues that the eleventh-hour production of Brady/Giglio materials "promised a wealth of material with which to impugn the credibility and motives of both of the [government's] chief trial witnesses." Due to the limited time available to review these materials, Rivera maintains that trial counsel for the defendants were not able to put the materials to good use. Rivera asserts that the defense thus failed to effectively establish, among other things, that Officer I: (1) was paid over $47,000 in benefits in excess of his police salary as compensation for his "active pursuit" of new targets for Operation Guard Shack; (2) used telephone calls and meetings to show his productivity to ensure the renewal of his $1,400 in monthly payments from the FBI; and (3) "convinced the FBI to give him a chance as an undercover agent after getting into too much (162 pages['] worth) [of] hot water as a local undercover officer." The last-minute disclosure also included impeachment evidence regarding Officer II, including prior misconduct investigations into allegations that he had abused his undercover position to engage in criminal activities like theft and extortion.

Noting that the district court made no findings and gave no explanation for denying the continuance, Rivera argues that any inconvenience to the court and the opposing party from a brief

of the government's star witnesses, not just in this case, but presumably in multiple cases resulting from Operation Guard Shack.

continuance would have been minimal, given that the government had just three witnesses -- all of whom were government agents. Rivera further maintains that the resulting prejudice was not limited to trial counsel's inability to put the Brady/Giglio material to good use, but rather that the denial resulted in systemic prejudice due to trial counsel's ineffective assistance throughout the trial.[31] Rivera concludes that as a result of the district court's "'myopic

---

[31] Throughout his brief, Rivera obliquely alludes to the allegedly ineffective assistance of his trial counsel, particularly in those sections challenging the denial of the continuance and the manner in which voir dire was conducted. However, Rivera does not squarely present ineffective assistance of counsel as a separate issue for our review on this direct appeal. Therefore, we need not consider the issue independently here. See, e.g., United States v. Williams, 630 F.3d 44, 50 (1st Cir. 2010).

Moreover, we do not generally address ineffective assistance claims on direct appeal, but instead require them to be raised on collateral review. See United States v. Neto, 659 F.3d 194, 203 (1st Cir. 2011); United States v. Martinez-Vargas, 321 F.3d 245, 251 (1st Cir. 2003) ("The law is firmly settled in this circuit that, as a general rule, fact-specific claims of ineffective assistance of counsel, not raised below, cannot be aired for the first time on direct appeal."). We deviate from this general practice and consider such claims on direct appeal "'only when such scrutiny of the factual record is unnecessary because the attorney's ineffectiveness is manifestly apparent from the record.'" Neto, 659 F.3d at 203 (quoting United States v. Rivera-González, 626 F.3d 639, 644 (1st Cir. 2010)) (internal quotation marks and alteration omitted).

While the record before us seems to contain at least some evidence suggesting a lack of diligence and a subpar performance on the part of Rivera's trial counsel, an ineffective assistance claim was not raised separately on direct appeal, and the record and arguments have not been not sufficiently developed on the issue. Therefore, we decline to find ineffective assistance of counsel at this time, without prejudice to Rivera's right to assert that claim in the district court through an application for collateral relief. See 28 U.S.C. § 2255; see also Neto, 659 F.3d at 203; Martinez-Vargas, 321 F.3d at 251.

insistence upon expeditiousness,'" his trial counsel was physically present but unable to participate as an effective advocate. (quoting <u>Ungar</u> v. <u>Sarafite</u>, 376 U.S. 575, 589 (1964)).

For its part, the government responds that Rivera's counsel was not diligent because he made his request for a continuance on the first day of trial, inconveniencing the court, the potential jurors, and the government. The government reasons that "36 hours was sufficient time to review [the <u>Brady</u>/<u>Giglio</u> documents] in preparation for trial." Noting that "[t]he defense was aware of the trial date as early as November 16, 2010, notwithstanding its single-day advancement," the government argues that twenty days was sufficient time to prepare for a trial that both sides agree was neither lengthy nor complex in terms of witnesses and exhibits. Further, the government maintains that Rivera's assertions of his counsel's ineffectiveness due to the denial of the continuance are "speculative and insufficient to show prejudice," and constitute a thinly-veiled ineffective assistance of counsel claim that should not be considered on direct appeal. Finally, the government argues that the defense's decisions may have been the result of a deliberate strategy, and the "more likely reason" for Rivera's conviction was the "overwhelming evidence" of his guilt, including the video.

We agree with Rivera that several relevant factors militated strongly in favor of granting a continuance. First, we

find that the time needed for effective preparation exceeded the time actually available.  While Rivera concedes that the case was neither lengthy nor complex in terms of witnesses and exhibits, we agree with him that the case involved difficult, time-intensive questions with respect to the limits of any potentially applicable entrapment or derivative entrapment defense, and the means available with which to present such a defense.  From the time that a trial date was first scheduled to the day trial began, the defense was left with only twelve business days to prepare.  Rivera asserts -- and the government has not disputed -- that at the final status conference, the district court ignored protestations from both defense counsel that they needed more time to prepare for trial.  To add insult to injury, without consulting the parties or providing any explanation, on the Friday before trial the court advanced the trial date by one day, to commence on Monday -- the next business day.

The final blow was delivered that same Friday afternoon by the government, when it dumped nearly 700 pages of <u>Brady</u>/<u>Giglio</u> materials on the defense.  The government has provided no explanation or excuse for making such a voluminous disclosure on the eve of trial, without providing the defense even a single business day to review the redacted, 689-page production.  Nor do we think a valid excuse exists here, given that: (1) Operation Guard Shack began as early as July 2008; (2) some of the underlying

impeachment documents, including FBI documents dated in the summer of 2008, were in the government's possession since near the beginning of the operation; and (3) the sham transaction for which Rivera and Delgado were prosecuted, and which involved Officers I and II, took place on July 24, 2009 -- one year and four months before trial. Under these circumstances, and in the absence of any explanation from the government, we fail to see how the eleventh-hour provision of the Brady/Giglio disclosures here could reflect anything other than ineptitude or strategic gamesmanship. For that reason, the government's argument that "36 hours was sufficient time to review [the documents] in preparation for trial" rings particularly hollow.

The evidence before us is mixed on how diligently Rivera's trial counsel used the twenty days (twelve of which were business days) available to prepare for trial. Though Rivera asserts that at the final status conference he requested more time to prepare for trial, he waited until 3:22 a.m. on the date of trial to file a written motion for continuance, thus contributing to his own predicament. However, this factor is mitigated at least in part by the developments of Friday, December 3, including the last-minute advancement of the trial date and the government's extensive Brady/Giglio disclosures that afternoon, which significantly changed the landscape on the eve of trial. The assertions by Rivera's trial counsel -- that despite having worked

-66-

all weekend, he was unable to fully review the Brady/Giglio materials and effectively prepare for trial -- weigh in favor of the probable utility of a one-week continuance to finish trial preparations in light of these new disclosures.

While a one-week continuance would have resulted in some minor inconvenience, that inconvenience is attenuated by several facts. First, as noted by Rivera, the government had only three witnesses, all of whom were government agents. Moreover, the government itself, through its last-minute Brady/Giglio disclosures, was responsible for one of the significant reasons for a continuance. The inconvenience to the court was diminished by the fact that the court had another trial scheduled for the same day. Earlier that morning, the court dismissed the jury in the other case, postponing that trial until the conclusion of Rivera's case.[32] Given also that (1) this was a relatively short, three-day trial; (2) the district court originally set a brief, accelerated trial schedule; and (3) no prior continuances were granted in the case, the extent of any inconvenience stemming from a one-week continuance would have been minimal. In sum, we find that the

---

[32] Immediately after the bench conference in which the court denied Rivera's motion for a continuance, the court addressed the Delgado/Rivera jury: "Members of the jury, I'm sorry that I had you waiting. I had to -- I had to select a jury for another case earlier today, this morning. . . . And I did that, and I sent those people away to start that trial after we conclude this one. So now we are going to select a jury for this one and start it right away."

balance of the foregoing factors weighed overwhelmingly in favor of granting the continuance.

Considering also that the district court did not review Rivera's written motion, did not review the Brady/Giglio materials disclosed, did not inquire regarding the quantity or specific nature of the production, did not ask the government the reason for the extreme tardiness of the disclosure, did not weigh the relevant factors on the record, and did not entertain more than a cursory argument on the issue, it would seem that the district court's denial constituted "'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" See Maldonado, 708 F.3d at 42 (quoting Morris, 461 U.S. at 11-12).

Nonetheless, we must consider one final factor: whether Rivera suffered prejudice as a result of the denial. See, e.g., Maldonado, 708 F.3d at 42; Espinal-Almeida, 699 F.3d at 615-16; Saccoccia, 58 F.3d at 770. "When Brady or Giglio material surfaces belatedly, 'the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect.'" Pérez-Ruiz, 353 F.3d at 8 (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990)). To demonstrate prejudice and overturn a verdict in the delayed disclosure context, an appellant must show both: (1) some specific prejudice beyond a mere assertion; and (2) that "there is a reasonable probability that, had the evidence been disclosed to the

defense in a timeous manner or had the trial court given the defense more time to digest it, the result of the proceeding would have been different."  Id. at 8-9.

Here, while we do not doubt that the defense would have been better prepared to impeach the government's witnesses if there had been more time to digest the Brady/Giglio materials, Rivera has failed to show a reasonable probability that the outcome of his case would have been any different if the trial court had granted the one-week continuance.  See id.  Rivera cites several facts from the Brady/Giglio disclosures -- including the undercover officers' compensation for the operation, and investigations into prior misconduct by Officers I and II -- that would have allowed Rivera to further "impugn the credibility and motives of both of the chief witnesses."  However, Delgado's counsel was in fact able to impeach Officer I's credibility by asking him, among other things, about his FBI compensation for participating in Operation Guard Shack; in response, Officer I testified that he received approximately $1,400 per month.  During cross-examination of the Special Agent, Rivera's trial counsel was able to ask about the alleged misconduct of both Officers I and II prior to their involvement with Operation Guard Shack.  Therefore, the defense did in fact use the information from the disclosures to impeach the testimony of Officers I and II.  Accordingly, in essence Rivera's claim is that -- were he given more time to review the materials -- he would have undertaken the

same trial strategy but would have done a somewhat better job of attacking the government witnesses' credibility.

Rivera has failed to explain how, if the Brady/Giglio materials had been disclosed earlier or if the continuance had been granted, he would have employed a different, more effective trial strategy.  See, e.g., United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir. 2002) (stating that an appellant cannot rely on "'wholly conclusory assertions'" but must make at least "'a prima facie showing of a plausible strategic option which the delay foreclosed'" (quoting Devin, 918 F.2d at 290)); United States v. Josleyn, 99 F.3d 1182, 1196 (1st Cir. 1996) ("[A] principal concern in delayed disclosure cases [is] whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." (emphasis added)).

And even if all the Brady/Giglio information had been more effectively presented to the jury, there is not a reasonable probability that the jury would have found that the government failed to satisfy the elements of the offenses of conviction beyond a reasonable doubt.  Rivera does not even allege that he could have used the Brady/Giglio material to prevent the government from meeting its burden of proof on any element of an offense of conviction.  Moreover, he does not challenge the district court's ruling that the entrapment defense applied only to Delgado.  Nor does Rivera argue before us now that the Brady/Giglio material

-70-

provided a factual basis for a valid derivative entrapment defense, or indeed, any other defense.[33]  The information contained in the disclosure fails to vitiate the video evidence of Rivera's participation in the sham transaction, which was corroborated by his codefendant's admissions at trial as well as the incriminating testimony provided by all three witnesses for the government.

Given that Rivera does not specifically articulate how the Brady/Giglio material at issue would have allowed him to either (1) effectively challenge the government's burden of proof on any element of an offense of conviction, (2) establish a foundation for a viable defense, or (3) employ a different, more effective trial strategy, he has failed to show a reasonable probability that the trial's outcome would have been any different if the court had granted his motion for a continuance.  See Pérez-Ruiz, 353 F.3d at 8-9.  Therefore, Rivera has failed to demonstrate specific and substantial prejudice, and -- although we are indeed troubled by what appears to be the district court's blind allegiance to speed over careful consideration of Rivera's justifiable request for a brief continuance -- his claim on this issue must ultimately fail. See Maldonado, 708 F.3d at 42-44; Pérez-Ruiz, 353 F.3d at 8-9.

---

[33]  As this issue was not raised on appeal, we express no opinion here as to whether an entrapment or derivative entrapment defense was available to Rivera.  See Williams, 630 F.3d at 50 (stating that underdeveloped arguments are deemed waived on appeal).

2. <u>Voir Dire</u>

Rivera further argues that the court's voir dire was inadequate to protect his right to a fair and impartial jury and to intelligently exercise his peremptory challenges. For the reasons described below, we find no merit to this claim.

Rivera explicitly concedes that the court did not improperly refuse to ask specific questions of the jurors and did not generally employ improper procedures during voir dire. Rather, he argues that the court's "race to trial left his counsel apparently incapable of participating in any way, either by suggesting issues to the Court or requesting follow up questions about issues likely to create significant prejudice [to] his right to a fair trial." In support of this argument, Rivera notes that his trial counsel proposed no questions, and in fact, "did nothing" during the voir dire process.

Rivera further argues that there were four substantive issues that did not receive adequate attention at voir dire: (1) the trial court should have asked more specific questions about the jurors' knowledge of Operation Guard Shack, instead of asking just one question concerning whether they knew about "the facts of the case"; (2) although the court asked whether any juror worked (or had a family member who worked) for a law-enforcement agency, the court should have "inquired [] further" into the issue; (3) the court should have asked the jurors regarding the fact that the

video of the sham transaction included references to the San Juan mayor as a "cokehead," which could have prejudiced jurors who supported the mayor against the defendants; and (4) the court should have explored the jurors' attitudes regarding homosexuality, given that the government later presented evidence and argument suggesting that Rivera was romantically interested in a male undercover officer.

Trial courts have "'broad discretion'" -- "'subject only to the essential demands of fairness'" -- in determining how to conduct voir dire. United States v. Misla-Aldarondo, 478 F.3d 52, 60 (1st Cir. 2007) (quoting Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987)). The Supreme Court has "repeatedly emphasized" that jury selection "is 'particularly within the province of the trial judge.'" Skilling v. United States, 130 S. Ct. 2896, 2917 (2010) (quoting Ristaino v. Ross, 424 U.S. 589, 594–95 (1976)). Accordingly, "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire," id., and we review the trial judge's voir dire questioning for abuse of discretion, United States v. Sherman, 551 F.3d 45, 49 (1st Cir. 2008) (citing United States v. Bergodere, 40 F.3d 512, 517 (1st Cir. 1994)). We grant "'special deference'" to the district court's determination of jury impartiality. Id. at 51 (quoting United States v. Moreno Morales, 815 F.2d 725, 733 (1st Cir. 1987)).

We find no such abuse of discretion here. First, as previously noted, the trial court did not refuse to ask any questions requested by Rivera's counsel. Counsel requested no questions, and even if he had, the court was entitled to "cover[] the substance of the appropriate areas of concern by framing its own questions in its own words." Real, 828 F.2d at 62 (finding that a trial court need not "pose every voir dire question requested by a litigant"). The record shows -- and Rivera does not dispute -- that the court asked a series of questions to identify potential biases and inquired as to whether prospective jurors could be fair and impartial in deciding the case. See Sherman, 551 F.3d at 52. Thus, we find no abuse of discretion in the general manner in which the district court chose to conduct voir dire.

We further find no merit to Rivera's four specific allegations of deficiencies in the voir dire process. With respect to the first two alleged deficiencies, Rivera admits that the district court asked about each issue. While the court did not refer to Operation Guard Shack during voir dire, it did review the facts alleged in the indictment with the prospective jurors, and added that the two defendants "were police officers from Puerto Rico at the time the facts of this case allegedly occurred." The court then asked if any of the potential jurors "have heard of something that may be related to the facts of this case." No one responded in the affirmative.

The court also asked if any prospective jurors were law-enforcement officers, or had "close relatives who are law-enforcement officers, police officers." None of the prospective jurors indicated that they were law-enforcement officers themselves; several told the court that they had family members who worked in law enforcement, but that this relationship would not affect their ability to be fair and impartial. Given that the trial court inquired into both these issues, and in the absence of a specific showing of prejudice or more developed argumentation, we do not find that the district court abused its discretion in the breadth and depth of its questioning.

With respect to Rivera's final two specific allegations of error, regarding disparaging comments concerning the mayor of San Juan and statements implicating Rivera's sexuality, Rivera concedes that the district court had no reason to know that either of these facts might become an issue in the trial. Hence, the court could not have exceeded its "broad discretion" when it failed to ask prospective jurors about specific facts unknown to the court, unraised by the parties, and not yet at issue. See Misla-Aldarondo, 478 F.3d at 60. On this record, Rivera has not shown that the district court abused its discretion in conducting voir dire and selecting a jury.

### 3. Alleged Evidentiary Errors

Finally, Rivera alleges five evidentiary errors, which he argues cumulatively undermined his right to a fair trial. We begin by examining each individual alleged error in turn.

#### a. Testimony on Suspicion of Prior Corrupt Acts

The first alleged evidentiary error identified by Rivera concerns the testimony of the government's first witness, the FBI Special Agent who helped set up the reverse sting. The Special Agent testified that he was responsible for preparing the "bricks," the undercover apartment, and the video equipment to record the sham transaction. Though he did not object at trial, Rivera now complains that the Special Agent was permitted to testify that, before approaching a target for a reverse sting, undercover agents must have had a "reasonable suspicion" that the target was "corrupt or involved in illegal activities or believed to be involved in illegal activities." Rivera asserts that such testimony was not relevant and was overwhelmingly prejudicial. He argues that the testimony served only to suggest to the jury -- without any supporting evidence -- that Rivera had committed some crime or similar bad act before becoming involved in the reverse sting.

Because Rivera failed to object at trial, we review the trial court's admission of the testimony for plain error. See United States v. Powers, 702 F.3d 1, 10 (1st Cir. 2012). The plain-error test is an "exacting standard." See Long v. Fairbank

Reconstruction Corp., 701 F.3d 1, 5 (1st Cir. 2012) ("To establish plain error, a party must show that there was error, that it was plain, and that it affected the party's substantial rights; an appellate court may then notice the error only if it 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" (quoting United States v. Borrero-Acevedo, 533 F.3d 11, 15 (1st Cir. 2008))).

Rivera's argument misses the mark. The government presented no evidence that the FBI targeted Rivera, or that any government agents approached him to recruit him for the transaction. Rivera was approached by his partner Delgado, who in turn was approached by Officer I. Thus, the allegedly prejudicial effects of which Rivera complains concerned whether the undercover agents had a reasonable suspicion of Delgado, not Rivera. Contrary to Rivera's argument, the Special Agent's testimony did not suggest that Rivera himself had previously committed some crime or similar bad act. While Rivera and Delgado were charged with conspiracy and aiding and abetting each other, Rivera fails to explain how the implication that the government agents may have had a reasonable suspicion of Delgado affected Rivera's substantial rights.

Given that the two codefendants were tried together, we do not think it improbable that an evidentiary error pertaining to one defendant could impact the rights of the other, or that a suggestion of corruption or criminality on the part of Delgado

could implicate Rivera by association. However, Rivera fails to connect the dots of such a theory, or explain how this alleged error meets the standard for plain-error review. Even assuming that it was error to admit the testimony, Rivera has not demonstrated that such an error was "plain," affected his "substantial rights," and "seriously affected" the fairness, integrity, or public reputation of the trial. See Long, 701 F.3d at 5. Thus, his cursory argument has fallen short of the "rather steep" road to success under the "exacting" plain-error standard. See Gelin, 712 F.3d at 620; Long, 703 F.3d at 5.

Rivera further alleges that the Special Agent's testimony regarding reasonable suspicion of corruption or illegal activities violated Federal Rules of Evidence 403, 404(b), 405, 602, 701, and 802. Apart from reciting these conclusory allegations, however, Rivera fails to specifically explain how the Special Agent's testimony violated these evidentiary rules. We need not consider such bare assertions on appeal. See Zannino, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

### b. Sexual Orientation Evidence

Secondly, Rivera argues that the introduction of evidence of the defendants' respective sexual orientations violated Federal Rules of Evidence 402 and 403 and violated his right to a fair

trial.  Rivera challenges the admission of two categories of such evidence: (1) evidence of Delgado's sexual orientation, and (2) evidence of Rivera's sexual orientation.  Where there was a proper objection at trial, we review the district court's evidentiary ruling for abuse of discretion; where no such objection was made, we review for plain error.  See Powers, 702 F.3d at 10.

### i. Delgado's Sexual Orientation

We begin with the introduction of evidence regarding Delgado's sexual orientation.  Because the defense properly objected to this evidence at trial, we review the admission of this testimony for abuse of discretion.  See id.

During the government's redirect examination of its first witness (the Special Agent referred to above), the government inquired as to whether the Special Agent knew "what Raquel Delgado's civil status is."  Delgado's counsel objected to the questioning as irrelevant and outside the scope of Delgado's cross-examination.  Seeking to inquire further as to the reasons for Delgado's divorce, the government proffered that "the agent interviewed Ms. Delgado's ex-husband, and he told him that they got divorced because she was having an affair with a female Sergeant." The court sustained the objection, explaining that "in the context of what we have in the case right now, it is extremely prejudicial, beyond the facts of the case."

Later in the trial, as previously described, Delgado testified that she had romantic affairs with Officer I, first in 2005, and then during the summer of 2009 when she was rejecting his persistent invitations of part-time employment. Delgado testified that in 2005, she and Officer I "had a sporadic relationship" during which they went on dates, visited each other's homes, and "slept together several times." She further testified that weeks after the sham transaction, she and Officer I again had sexual intercourse. An important component of Delgado's defense, theory of the case, and trial strategy was that Officer I improperly induced her to participate in the sham transaction by appealing to their long-lasting friendship and romantic relationship.

Delgado's ex-husband also testified for the defense, stating -- among other things -- that he and Delgado "were boyfriend and girlfriend for almost three years, and we were legally married for five years." He testified that he and Delgado had children together, but eventually divorced and stopped communicating regularly except through their children.

During its cross-examination of Delgado's ex-husband, the government asked: "In fact, didn't you tell the FBI if they wanted to know any details about Raquel Delgado's wife -- or rather life, you would have to ask her girlfriend, San Juan Municipal female Sergeant Wanda Rivera?" Delgado's counsel objected, and the court responded: "Overruled. Isn't that what you told the agents? . . .

You have to answer the question, sir.  That's not an answer.  You have to answer the question."  In response, Delgado's ex-husband answered: "What I said was that if he wanted -- if they wanted to know about Mrs. Delgado, they should ask her friends, and Mrs. Wanda Rivera, who would have direct information."

The government immediately pressed the point further: "Wait a minute.  You didn't tell the FBI that when you divorced Raquel Delgado, she was having an affair with Sergeant [Rivera]."  At this point, the court overruled another objection from Delgado's counsel, who then requested a sidebar.  The court explained its reasoning to Delgado's counsel as follows:

> [N]ow it's relevant, because you are -- you are intimating in your evidence . . . that there is a man-woman relationship between the witness and your client.  And I think the jury should consider whether there was a lesbian relationship between this woman and somebody else, because one thing is kind of inconsistent with the other.
> Usually lesbians or gay people don't cross lines to the opposite sex.  Don't you think?

Counsel disagreed, and the court responded, "Well, that's what I understand. . . .  That's what I've learned and seen in my 67 years of age."

Delgado's counsel argued that the government was trying to elicit statements regarding Delgado's sexual orientation in order to divert the jury's attention from facts relevant to the defense of entrapment -- whether she had a predisposition to commit

-81-

a crime or if she was improperly induced -- to a matter (her sexual orientation) that had no bearing on the case. Counsel continued: "She could have a perfect relationship with this man. She had it for 16 years. And she also had a relationship with a woman. And that doesn't make her a criminal. . . . It doesn't make it impossible to concede she had another male relationship." The court replied, "[b]ut it is kind of inconsistent." When Delgado's counsel began to argue that the evidence was "extremely prejudicial" under Rule 403, the court concluded: "well if you're asking under 403, the balancing is that it's relevant. Overruled." With that, the bench conference concluded, and the government continued asking the witness about Delgado's same-sex relationship.

The inadequacy of the district court's faulty reasoning and Rule 403 "balancing" on this issue should be immediately obvious from the excerpts of the trial transcript referenced above. Nonetheless, we will spell out a few of the concerns here. The competing arguments were effectively presented by Delgado's counsel (in favor of exclusion) and the district court (in favor of admission). To the extent that the disputed testimony had any relevance to a fact of consequence in determining the case, such putative relevance was predicated on the idea that Delgado's one alleged homosexual relationship made it somewhat less probable that she also engaged in a heterosexual romantic relationship with Officer I, which in turn had some bearing on her entrapment

defense. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Whatever limited probative value this evidence might have had in isolation, however, was further undercut by the undisputed testimony of Delgado's ex-husband that the two had children together and maintained an eight-year heterosexual relationship -- including three years of dating and five years of marriage. Regardless of what the district judge may have previously "learned and seen in [his] 67 years of age" about "lesbians or gay people [not] cross[ing] lines to the opposite sex," there was specific, uncontroverted testimony in this very case that Delgado maintained an eight-year heterosexual relationship with her ex-husband.

No evidence was presented that Delgado was not interested in sexual relationships with men, or even that she preferred women to men as sexual partners. Accordingly, evidence of one relationship with another woman had -- at best -- marginal relevance to the question whether she had a sexual relationship with Officer I. Moreover, Delgado's entrapment defense did not hinge solely on the sexual nature of her relationship with Officer I, but rather also on testimony that the two had been friends since middle school, and that Officer I appealed to this relationship and

solicited her on a near-daily basis for approximately one month before she acquiesced to provide security for the sham transaction.

As evinced in part by the government's persistence in hammering the largely irrelevant point of Delgado's same-sex relationship, evidence of homosexuality has the potential to unfairly prejudice a defendant. See, e.g., United States v. Yazzie, 59 F.3d 807, 811 (9th Cir. 1995) ("[E]vidence of homosexuality can be extremely prejudicial . . . ."); United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993) ("We accept without need of extensive argument that implications of . . . homosexuality . . . unfairly prejudice a defendant." (footnote omitted)); State v. Ford, 926 P.2d 245, 250 (Mont. 1996) ("There will be, on virtually every jury, people who would find the lifestyle and sexual preferences of a homosexual or bisexual person offensive. . . . [O]ur criminal justice system must take the necessary precautions to assure that people are convicted based on evidence of guilt, and not on the basis of some inflammatory personal trait."); ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8(c), p. 106 (3d ed. 1993) ("The prosecutor should not make arguments calculated to appeal to the prejudices of the jury."). Given the extremely low probative value of the evidence pertaining to Delgado's same-sex relationship, we think it patently obvious that its minimal probative value was substantially outweighed by the dangers of

unfair prejudice, confusing the issues, and misleading the jury. See Fed. R. Evid. 403.

It is true that "[w]e give great deference to a district judge's balancing of probative value versus unfair prejudice." United States v. Breton, No. 12-2293, 2014 WL 30517, at *10 (1st Cir. Jan. 6, 2014). This is the case "even when a judge does not expressly explain the Rule 403 balancing process on the record." Id. But while our review of a trial court's Rule 403 decision is deferential, it "is not completely without bite." Espeaignnette v. Gene Tierney Co., Inc., 43 F.3d 1, 5 (1st Cir. 1994). Here, we find that the trial court abused its discretion because, for the reasons explained above, the court made a serious mistake in weighing the danger of unfair prejudice against the testimony's minimal probative value. See id.; see also Corporate Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013).

That determination does not end the inquiry, however. See Espeaignnette, 43 F.3d at 9. We may not disturb the verdict if the error was harmless -- that is, if it did not affect Rivera's substantial rights. See id.; see also Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a). For an evidentiary error of non-constitutional dimension, the error is harmless if we "can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" United States v. Melvin, 730

F.3d 29, 39 (1st Cir. 2013) (quoting <u>United States</u> v. <u>Sasso</u>, 695 F.3d 25, 29 (1st Cir. 2012)); <u>Espeaignnette</u>, 43 F.3d at 9.  We have such fair assurance here.

For many of the same reasons that the testimony at issue was not highly probative of a fact of consequence in determining the action, the testimony was unlikely to have substantially swayed the jury's verdict as to Rivera.  On the theory espoused by the government and the district court, evidence of Delgado's sexual orientation was introduced to impugn one aspect of Delgado's testimony on the improper inducement element of her entrapment defense -- whether she had a romantic or sexual relationship with Officer I.  Delgado's sexual orientation has little to do with whether the elements of the offenses were satisfied as to Rivera or whether Rivera had a viable defense.  The trial testimony and video provide damning evidence that Rivera participated in the sham transaction and satisfied the elements of the offenses of conviction.  Furthermore, as previously discussed, Rivera does not challenge the district court's ruling that no entrapment or derivative entrapment defense was available to him.  For those reasons, the district court's error in allowing testimony as to Delgado's sexual orientation was harmless as to Rivera, and we will not disturb the judgment below on the basis of this error.  <u>See</u> Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a); <u>Espeaignnette</u>, 43 F.3d at 9.

## ii. Rivera's Sexual Orientation

Turning to evidence of Rivera's sexual orientation, we next consider his argument that what he deems to be "homosexual banter" in the video of the sham transaction -- coupled with testimony and argument which suggested that he was sexually interested in Officer III, the male undercover agent playing the role of the buyer -- sent a clear message to the jury about Rivera's homosexuality in order to "prey on long-standing and deeply rooted prejudices about homosexuals as deviants, miscreants, sinners and criminals." Specifically, Rivera directs our attention to three types of allegedly improper references to his sexual orientation at trial: (1) the "homosexual banter" among the participants depicted in the video of the sham transaction; (2) the testimony by Officer I that Rivera wanted the phone number of Officer III in order to give him a present and "get in touch with him" after the sham transaction;[34] and (3) the testimony by Officer

---

[34]   During its opening statement, the government referenced this expected testimony from Officer I, arguing that Rivera "was so comfortable with the situation, he want[ed] a phone number of the buyer" -- Officer III -- after the deal was over.  Indeed, the government continued to stress that after the sham transaction was completed, Rivera contacted Officer I "several times" because he wanted Officer III's phone number.  At that point, Rivera's counsel objected, and asked to approach the bench.  The court overruled the objection without sidebar, explanation, or further discussion, instructing the government to "[g]o ahead."  The government continued: "[Rivera] wants his phone number because he has a souvenir for him and wants to go out with him."  Given the objection at trial, we review the district court's admission of this statement in the government's opening for abuse of discretion.  See Powers, 702 F.3d at 10; see also McPheeters v. Black & Veatch

II that "Angel [Rivera] was kind of interested in the guy, the other guy that was there" (presumably referring to Officer III). There were no objections at trial to these three types of evidence of Rivera's sexual orientation, so we review their admission for plain error.  See Powers, 702 F.3d at 10.

Even if it was error to admit the foregoing evidence and argument, such an error will not permit us to overturn Rivera's conviction if the error was harmless.  See Fed. R. Crim. P. 52(a); see also Landrón-Class, 696 F.3d at 68; United States v. York, 572 F.3d 415, 429 (7th Cir. 2009) ("Under either a plain error standard or an abuse-of-discretion standard, if those errors were harmless, [appellant's] conviction will stand.").  Here, we find that "it is highly probable" that any error in allowing evidence of Rivera's sexual orientation did not affect the verdict; thus, any such error was harmless.  See Pridgen, 518 F.3d at 91.

We agree with Rivera that evidence of his homosexuality was "relevant to nothing."  However, that same irrelevance cuts against him on the harmless-error analysis here.  Rivera's sexual orientation had absolutely nothing to do with whether his conduct satisfied the elements of the offenses of conviction, or whether he had a valid defense.  Rivera  fails  to explain -- under the particular facts of this case -- precisely how evidence of his

Corp., 427 F.3d 1095, 1102 (8th Cir. 2005) ("We review a district court's management of opening statements for an abuse of discretion.").

homosexuality affected the jury's guilty verdict regarding his participation in the sham transaction.

Unlike Delgado, Rivera did not seek to support an entrapment defense by presenting testimony and argument that an undercover agent improperly induced him to participate in the transaction by means of a romantic or sexual relationship. And Rivera makes no argument that the government's evidence was otherwise so weak that evidence of his homosexuality was likely to have tipped the scales against him. Particularly given the highly incriminating evidence here -- including the video recording and the testimony of the government witnesses and his codefendant -- there is a high probability that the alleged error concerning Rivera's homosexuality did not affect the verdict. See id. Therefore, any such error was harmless and cannot serve to overturn his conviction. See id.; see also Fed. R. Crim. P. 52(a); Landrón-Class, 696 F.3d at 68; York, 572 F.3d at 429-30.

c. Requiring Delgado to Admit the Charges

In his third allegation of evidentiary error, Rivera argues that the district court violated his right to a fair trial when it required his codefendant Delgado to testify whether she admitted all the allegations of the indictment. He further maintains that "[t]he Court's sua sponte insistence on requiring Delgado to admit her culpability to the charge that she conspired

with [Rivera] demolished the presumption of innocence to him, no matter how she answered."

Delgado testified in her own defense at trial. During direct examination by her counsel, with regard to the sham transaction, Delgado admitted that she "understood that what [Officer I] was doing was not something legal," and that she expected that she and Rivera would each make $2,000 for their participation. Delgado also testified that "[a]fter all this insistence" from Officer I, she contacted Rivera, and together they "decided to go to the place" of the transaction. She further responded in the affirmative when her counsel asked, "Now, you were aware those were narcotics? You realized it was something wrong you were doing?" There were no objections to any of this testimony.

The government began its cross-examination of Delgado by immediately asking whether she admitted to participating in the drug transaction. She agreed, saying, "I've admitted I did it, as I said, and I repeat, because of [Officer I's] insistence and because of the relationship, the sentimental or romantic relationship I had with him and my trust in him." Hearing that, the government pressed her further: "So you admit every count in this Indictment; is that correct?" Delgado responded, "I was there, I repeat, I didn't --." The district judge cut her short, interjecting, "[t]he question is whether -- we want an answer

whether you admit all the charges that are against you in this accusation. That's all."

Delgado's counsel objected, arguing that the question improperly elicited an answer as to the charges, although Delgado had already entered a plea. The court overruled the objection, and the government continued to press the point, asking whether she did the things alleged in the indictment. Delgado continued to respond that she "was there, and [her actions were] wrong." She admitted that she knew the transaction involved drugs, but she did not admit that she knew the type of drug or the quantity involved. Again, Rivera's counsel did not object to this line of questioning.

On appeal, Rivera argues that the district court erred by not "remain[ing] alert" to his right against self-incrimination when Delgado waived her own right in her testimony at trial. In Rivera's view, the district court "demolished the presumption of [his] innocence" when it forced Delgado to admit the charges on the stand, requiring Rivera "to rebut this powerfully incriminating evidence." Rivera further complains that no appropriate curative instruction was given, and argues that this was a plain error of constitutional dimension.

We agree with Rivera that it was highly improper -- for not just the prosecution, but especially for the trial judge himself -- to ask Delgado on the stand whether she admitted all the charges against her. See, e.g., United States v. Levine, 180 F.3d

869, 872 (7th Cir. 1999) (stating that "the judge [must] make[] it clear to the jury that neither the questioner nor the witness defines the elements of the offense"); United States v. Espino, 32 F.3d 253, 257 (7th Cir. 1994) (finding the question whether the defendant was "admitting the conspiracy" to be improper because it required a conclusion about the legal consequences of the defendant's conduct, and not just about the predicate facts for such a conclusion -- namely, the existence of a conspiratorial agreement). Even assuming an error of constitutional dimension with respect to the questions asked of Delgado, however, we find that the government has met its burden of proving beyond a reasonable doubt that the error did not influence Rivera's verdict. See Melvin, 730 F.3d at 39 (quoting Sasso, 695 F.3d at 29).

With respect to the relevant testimony elicited from Delgado on cross, she did not ultimately yield to the demands of the prosecution and the district court to state a legal conclusion as to whether she was guilty of the counts charged in the indictment. Nor did she make any factual admissions that were materially different from her testimony on direct examination. Delgado's testimony, on both direct and cross, was consistent with her theory of the case -- namely, that she participated in the sham transaction, but that she was entitled to an entrapment defense because she was improperly induced by Officer I. Therefore, the exchange of which Rivera complains did not alter the nature or

extent of the evidence before the jury.  We are convinced beyond a reasonable doubt that the introduction of Delgado's redundant testimony on cross did not influence the verdict; hence, any error on this issue was harmless.  See id.

### d. Restriction of Cross-Examination, and Opinion Testimony from Lay Witnesses

Lastly, Rivera seeks to piggyback on Delgado's arguments regarding two final alleged evidentiary errors: (1) that the district court unduly restricted cross-examination to issues raised on direct, thereby refusing to allow proper impeachment questions; and (2) that the court erred by admitting inadmissible lay opinion testimony from Delgado's ex-husband.

Rivera's brief devotes a grand total of five sentences to addressing these two issues.  And two of those five sentences merely state that Rivera adopts the relevant arguments presented in Delgado's brief.  Rivera was certainly entitled to join in Delgado's brief or to adopt by reference parts of her brief.  See Fed. R. App. P. 28(i).  However, "[a]doption by reference cannot occur in a vacuum and the arguments must actually be transferable" from Delgado's case to Rivera's appeal.  See United States v. Brown, 669 F.3d 10, 16 n.5 (1st Cir. 2012).  "In this context, issues that are averted to in a perfunctory manner absent developed argumentation are waived."  Id.  Here, as in Brown, Rivera's attempt to join Delgado's arguments on these two errors was

"textbook perfunctory -- he offered <u>no</u> explanation as to why her arguments pertained to him." <u>See</u> <u>id.</u>

Delgado's argument on the first issue focused on her claim that the improper limitations on the cross-examination of Officer I "prevented Delgado [] from presenting important evidence that aided her in establishing her only defense, that she was entrapped by [Officer I] into participating in the offense conduct." With respect to the second issue, Delgado argued that the admission of improper lay opinion testimony from her ex-husband "cannot be considered harmless since precisely the matter [on] which he expressed an opinion o[r] belief concerned the most crucial ultimate issue of fact at trial; that the jury should reject Delgado['s] entrapment defense based on his opinion as to what he would do under similar circumstances." Thus, both issues concern Delgado's sole defense of entrapment.

As previously discussed, Rivera does not appeal the district court's ruling that no such defense was available to him. Having failed to "'connect the arguments adopted with the specific facts pertaining' to him," Rivera has not properly adopted Delgado's arguments. <u>See</u> <u>United States</u> v. <u>De La Paz-Rentas</u>, 613 F.3d 18, 29 (1st Cir. 2010) (quoting <u>United States</u> v. <u>Bennett</u>, 75 F.3d 40, 49 (1st Cir. 1996)). For that reason, Rivera has waived these two issues. <u>See</u> <u>Brown</u>, 669 F.3d at 16 n.5. Moreover, even without a finding of waiver, we are convinced that any alleged

error with respect to these two evidentiary issues was harmless. See <u>Melvin</u>, 730 F.3d at 39.

### e. <u>Cumulative Error</u>

Having found that none of the five evidentiary errors alleged by Rivera are individually cause for relief, we turn finally to his claim that these errors cumulatively undermined his right to a fair trial. We have previously accepted the "theoretical underpinnings" of such a cumulative-error claim -- namely, that "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1195-96 (1st Cir. 1993). In examining such claims, we weigh the trial errors "against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); and the strength of the government's case." <u>Id.</u> at 1196.

Rivera was entitled "to a fair trial, not to a mistake-free trial." <u>See</u> <u>id</u>. Considering the nature of the errors here, we find that these errors were largely tangential to facts material to the jury's adjudication of Rivera's guilt. As previously described, the government's case against Rivera was strong; it included testimony by three government agents involved in the

sting, as well as a video depicting Rivera's participation in the sham transaction. Moreover, Rivera's codefendant Delgado testified that she and Rivera participated in the transaction. On this record, we cannot say that the five alleged evidentiary errors cumulatively "call into doubt the reliability of the verdict and 'the underlying fairness of the trial.'" See United States v. Sanabria, 645 F.3d 505, 519 (1st Cir. 2011) (quoting United States v. Meserve, 271 F.3d 314, 332 (1st Cir. 2001)). Therefore, like his individual allegations of evidentiary error, Rivera's cumulative-error claim must also fail.

### III. Conclusion

Based on the foregoing, Delgado's convictions are vacated and her case is remanded for a new trial.

With respect to Rivera's case, for the reasons described above, his sentence cannot stand in light of the Supreme Court's decision in Alleyne. We therefore withhold judgment on his convictions for thirty days, during which time the government can request either that we affirm Rivera's convictions and remand for resentencing under 21 U.S.C. § 841(b)(1)(C), or that we vacate Rivera's convictions and remand for a new trial, allowing the question of drug quantity to be properly submitted to a jury applying the beyond-a-reasonable-doubt standard.

**Vacated and remanded in part, and judgment withheld in part.**